**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**NATIONAL BANKERS LIFE INSURANCE CO. et al., Defendants.**

Civ. A. 3–4432–B.

United States District Court,
N. D. Texas,
Dallas Division.

March 3, 1971.

As Amended March 11, 1971.

Gerald E. Boltz, Robert F. Watson and Ernest Steve Watson, Ft. Worth, Tex., for plaintiff.

Morton Susman, Houston, Tex., for defendants.

HUGHES, District Judge.

Prior to the start of the hearing on the request for a preliminary injunction, the court established ground rules, some of which included the following:

(1) Plaintiff's affidavits, transcripts of testimony, exhibits thereto, and other supporting documents filed as exhibits to plaintiff's motion for preliminary injunction would be received by the court in support of plaintiff's motion for preliminary injunction.

(2) Affidavits, exhibits thereto and other supporting documents filed by the

defendants in opposition to plaintiff's motion for preliminary injunction would be received by the court in response to plaintiff's motion for preliminary injunction.

(3) The court would permit oral testimony subject to reasonable limitations at the hearing.

Though not included as such in the formal order of proceedings, the court made it clear to counsel for the plaintiff that in those instances where defendants introduced affidavits challenging elements of the plaintiff's case, absent sufficient additional facts brought to light during the actual hearing, the court would not grant the requested relief solely on the basis of affidavits and exhibits already on file.

Defendants Carr and Ling filed controverting affidavits prior to the start of the hearing and defendant McCain filed an affidavit during the hearing.

Plaintiff offered no witnesses of its own though it did cross examine defendants' witnesses and did make available several of its investigators who were then called as witnesses by defendants.

Prior to and during the hearing a number of defendants entered into consent decrees as to the preliminary injunction. By the conclusion of the hearing only seven of the original 28 defendants had not entered consent decrees. Three entered consent decrees as to the permanent injunction, eighteen as to the preliminary injunction.

### Findings of Fact

1. From about November 1967 until about July 1970, defendant John Osorio was president, a director and a member of the executive and finance committees of National Bankers Life Insurance Company, a trustee of National Bankers Life Employees Retirement Plan, a director of South Atlantic Company and continuing to the date hereof a controlling shareholder of South Atlantic Company and Nashwood Corporation. Defendant Osorio was likewise from about November 1967 until about July 1970 a controlling shareholder of City Bank & Trust Company and from about April 1969 until about July 1970 a controlling shareholder of Dallas Bank & Trust Company.

2. Defendant Waggoner Carr was, from about March 1969 until about July 1970, a controlling shareholder of Dallas Bank & Trust Company and City Bank & Trust Company and was from about March 1969 until late June 1970 a controlling shareholder of South Atlantic Company. He was a controlling person of Nashwood Corporation until the fall of 1970. Defendant Carr was from about April 1969 until July 1970 an officer and director of Ric International Industries, Inc. Defendant Carr has denied detailed knowledge of the operations of any of these entities except Ric and no evidence to the contrary has been introduced.

3. Defendant Michael F. Ling, as chairman of the executive committee of Ling & Company and as owner of 30 to 32 percent of its stock during the time covered by the complaint, exercised certain management functions, hired and fired employees, received monthly reports, attended board meetings, promoted the company's financial interests and received inventory reports.

4. The following transactions were made at a time when no effective registration statement pursuant to the Securities Act of 1933 was on file with the Securities & Exchange Commission:

(a) On or about December 31, 1969, defendant Nashwood purchased approximately 5931 shares of National Bankers Life (NBL) stock and pledged these shares as collateral for a loan from Dallas Bank & Trust Company which was used to make the purchase.

(b) On or about November 30, 1969, defendant Osorio sold approximately 1000 shares of Master Control, Inc., (MCI) stock to Ling & Company, Inc.

(c) On or about February 13, 1970, defendant Osorio sold approximately 1000 shares of MCI stock to Ling & Company, Inc.,

(d) In May 1970 defendant Hoover pledged more than 500,000 shares of Ric stock as collateral for loans at various banks in Texas. Part was pledged on behalf of South Atlantic Company and part in his own behalf. At the time of these transactions, South Atlantic Company owned controlling interest in Ric.

(e) In December 1969, defendant Nashwood pledged 66,666 shares of NBL stock as collateral for a loan from Sharpstown State Bank. These shares had been obtained directly from National Bankers Life.

(f) On or about October 22, 1969, defendant H. E. McCain sold approximately 800 shares of MCI stock to Ling & Company, Inc.

(g) On or about January 28, 1970, defendant McCain pledged approximately 3640 shares of NBL stock as collateral for a loan at Bank of Services & Trust which was used to purchase the stock.

(h) In about January 1970, defendant Hoover pledged 5000 shares of NBL stock as collateral for a loan at South Oak Cliff Bank which had been used to purchase the stock.

(i) In about March 1970, defendant Hoover pledged 5000 shares of NBL stock as collateral for a loan at Industrial Bank of Houston which had been used to purchase the stock.

(j) Between July 1969 and May 1970 Ling & Company purchased and sold approximately 384,000 shares of NBL stock; between September 1969 and May 1970, Ling & Company purchased and sold approximately 220,000 shares of Olympic Life Insurance Company stock; between October 1969 and October 1970, Ling and Company purchased and sold approximately 200,000 shares of MCI stock. Statements on file with the court, which are uncontroverted by affidavits or by Michael Ling's testimony, reveal that several employees at Ling & Company were handling these sales exclusively and that defendant Ling had some direct contact with these employees both to authorize market making activities and to discuss the accounts generally.

5. The absence of a number of defendants from the preliminary hearing because of consent decrees limited the evidence available on the question of employment of a scheme to defraud; however, the following acts by defendants contesting the preliminary injunction were established:

(a) Beginning in about July 1969, and continuing through about June 1970, Ling & Company made a market in the stock of defendant National Bankers Life. During that period Ling & Company constantly quoted NBL stock at ever-increasing prices, purchased NBL stock principally from brokers and sold the stock principally to customers, with the effect of manipulating the market price of stock upward. During this time to help out the market maker defendants Hoover, McCain, Nashwood and South Atlantic Company bought NBL stock with either loans obtained from financial entities controlled by the defendants in the case or backed by letters of guarantee from financial institutions controlled by defendants in the case. A number of similar transactions were entered into in the stock of Olympic Life and MCI; however, not all the above four defendants were involved in transactions in both of these stocks.

(b) In about March of 1970, NBL Employees Retirement Plan purchased approximately 22,500 shares of NBL stock from Ling & Company with money borrowed from Dallas Bank & Trust Company which at that time was owned by South Atlantic Company. The Plan paid $4.00 per share more than the then current market price.

(c) In about July 1970, the Plan sold 22,500 shares of NBL to the Jesuit Fathers of Houston at 28½ per share, at a time when the market price was $5.00 per share.

*Conclusions of Law*

The plaintiff SEC has approached this case solely in terms of complete joint liability on the part of all 28 defendants on both counts—sale of unregistered securities and fraudulent conduct. It has

employed a conspiracy theory on the first count and on the second count a joint scheme theory which is comparable to conspiracy. However, in the opinion of this Court it must first be determined if any individual violations have been committed before determining joint liability under the theories of conspiracy or joint scheme.

1. There are four areas of individual violations that must be examined: (1) Being a principal in the sale of specified unregistered securities under Section 5 of the Securities Act of 1933; (2) Aiding and abetting the sale of specified unregistered securities; (3) Being a principal in fraudulent conduct under Section 17(a) of the 1933 Act or Rule 10(b) (5) of the 1934 Act; or (4) Aiding and abetting fraudulent conduct. As will be seen in the discussion below, aiding and abetting fraudulent conduct can yield total joint liability but it does not have to do so in all cases.

■ (a) Being a principal in the sale of specified unregistered securities: Liability arises when the person so participating falls into the category of "issuer" or "underwriter." The term "issuer" includes both the company issuing stock and control persons of that company. A control person is liable for his sales of stock in a company he controls even when his broker is able to claim an exemption. United States v. Wolfson, 405 F.2d 779 (2nd Cir. 1968). "Underwriter" has become a very broad category. As pointed out in Securities & Exchange Commission v. North American R & D Corp., 424 F.2d 63, 72 (2nd Cir. 1970) "the term 'underwriter' is broadly defined to include anyone who directly or indirectly participates in a distribution of securities from an 'issuer' to the public; and, for this purpose the term 'issuer' is defined to include not only the issuer but also affiliates or subsidiaries of the issuer and 'any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.' "

■ (b) Aiding and abetting the sale of specified unregistered securities: Certain acts by persons other than issuers or underwriters are so intertwined with the acts by those persons that they are liable on the basis of aiding and abetting in the violation of Section 5 of the Securities Act of 1933. Under this theory a defendant could be held liable if he was involved in the acquisition of the shares to be sold. Nees v. Securities & Exchange Commission, 414 F.2d 211, 220 (9th Cir. 1969). Further a defendant could be held liable merely for taking "steps necessary to the distribution." Securities & Exchange Commission v. North American R & D Corp., supra, 424 F.2d at 81. No intent is required to violate Section 5 as an aider and abettor and the only knowledge requirement is that a defendant "had reason to know or should have known that the securities should have been registered." Nees v. Securities & Exchange Commission, supra, 414 F.2d at 220–221.

For purposes of Section 5 of the Securities Act of 1933 the pledge of unregistered securities as collateral for a loan is the same thing as a "sale" because it causes the bank to become an underwriter when it forecloses and sells the collateral. Securities & Exchange Commission v. Guild Films Co., Inc., 279 F.2d 485 (2nd Cir. 1960).

■ (c) Being a principal in the fraudulent conduct under Section 17(a) or Rule 10(b) (5); The landmark case of Securities & Exchange Commission v. Texas Gulf Sulphur, 401 F.2d 833 (2nd Cir. 1968) has done much to broaden liability under Rule 10(b) (5) and by application Section 17(a) (which is substantially similar to Rule 10(b) (5)). Perhaps the two most far reaching effects of the *Texas Gulf Sulphur* case were to eliminate any requirement that a defendant must have personally either bought or sold the stock involved as a prerequisite for liability and to eliminate scienter (fraudulent intent) as a prerequisite for an individual violation. On the first point, see 401 F.2d at 860; on the second, *id.* at 854–855. In fact,

the *Texas Gulf Sulphur* case went so far as to hold that negligence alone is a basis for an individual violation under Rule 10(b) (5). *Accord* Securities & Exchange Commission v. Pearson, 426 F.2d 1339, 1343 (10th Cir. 1970). Thus a defense of "no knowledge" would be insufficient if the person, by exercising due diligence, could have found out that his conduct was a violation of Rule 10(b) (5). *See* Securities & Exchange Commission v. North American R & D Corp., *supra*, 424 F.2d at 83. The most common violations of Rule 10(b) (5) are misleading statements or omissions of material facts under subsection (2); also, there are a variety of general fraudulent acts which may be included under subsection (3). However, instead of relying primarily on either of those subsections, the SEC has sought to hold all the defendants liable for joint participation in a "scheme to defraud" under subsection (1) on the basis that "scheme" as used in that subsection is synonymous with conspiracy. For the purposes of this case, we will assume that the SEC intended to allege that peripheral defendants were aiders and abettors to a scheme or plan under subsection (1) and in this sense were co-schemers. As will be discussed below, there is a knowledge requirement for liability for aiding and abetting fraudulent conduct.

■■■ (d) Aiding and Abetting fraudulent conduct under Section 17(a) or Rule 10(b) (5): Aiding and abetting in the context of this case is an elusive concept and can provide the necessary link to total joint liability though it does not have to do so. In the narrow sense, a defendant could have aided and abetted a particular fraudulent act under 10(b) (5) (2) or 10(b) (5) (3) or use of a particular device under 10(b) (5) (1) and thus be liable for only the results of that specific violation. In the more expansive sense, a defendant could have aided and abetted a general scheme under 10(b) (5) (1) and thus be liable for the results of all aspects of the scheme (assuming the scheme was a broad one). It is clear that the defendant must have some knowledge of the fraudulent act or scheme he is aiding, though that knowledge may be actual or constructive. Brennan v. Midwestern United Life Insurance Co., 259 F.Supp. 673 (N.D.Ind.1966). The *Brennan* case further indicates that a person may be held as an aider and abettor through either an act *or* an omission. *Id.* at 682. One commentator, speaking in the context of aiding a general scheme, has described the requisite knowledge as follows: the defendant must have some general awareness that his role is part of a complex activity and that the overall conduct is in some way improper. A. Bromberg, Securities Law: Fraud— SEC Rule 10(b) (5), Sec. 8.5 (582) p. 208.45 (1970 Supp.). It is clear that the degree of knowledge necessary can be shown by circumstantial evidence. Securities & Exchange Commission v. Scott-Taylor & Co., 183 F.Supp. 904 (S. D.N.Y.1959).

■■ 2. As indicated above, the plaintiff can employ the aiding and abetting theory to establish complete joint liability under the second count— fraudulent conduct—because of the presence of the word "scheme" in Rule 10(b) (5) (1) and the possibility of reading "scheme" as synonymous with a conspiracy. Even though there is no reference to "scheme" or "conspiracy" in Section 5 of the Securities Act of 1933 —the section governing the first count of selling unregistered securities—certainly the plaintiff can allege a conspiracy to violate that section as it has done in count one. The knowledge requirement for liability under such a scheme is more than that required to hold someone as an aider and abettor to a single sale of unregistered stock or a single fraudulent act and probably something comparable to that required to hold a person liable as an aider and abettor to a scheme to defraud—general awareness of overall improper conduct and that the act performed in some way contributes to that conduct.

■ 3. The securities of NBL, Olympic and MCI sold by Ling & Co., Inc. were not subject to an effective registration. Ling & Co., were it still in existence and named as a defendant, could not have claimed an exemption because Ling & Co. through its employees would be deemed to have had knowledge that its sales were part of a distribution. As indicated by the findings of fact, defendant Ling exercised sufficient supervision over the company and its salesmen that he knew or should have known of the improper sales and is responsible for the violations of Section 5 of the Act of 1933. Gross v. Securities & Exchange Commission, 418 F.2d 103 (2nd Cir. 1969). He must be considered as an aider and abettor in the sales.

■ Though the question is a close one, there is insufficient evidence to hold defendant Ling also responsible for any acts of manipulation or deception by brokerage house employees.

■ 4. As demonstrated by the findings of fact, defendant McCain pledged unregistered stock of MCI and NBL on two occasions. In so doing, McCain was acting as an underwriter and was in violation of Section 5(a) and (c). There is insufficient evidence, however, to establish that defendant McCain engaged in any conduct to defraud or that he was a knowing member of a scheme to defraud in violation of Section 17(a) or Rule 10(b) (5).

■ 5. As demonstrated by the findings, defendant Osorio on at least two occasions sold unregistered MCI stock. Further, he was a control person of defendant South Atlantic Co. and Nashwood. The evidence established that he was actively involved in the operation of these firms and was actively involved in the operation of financial institutions named in the complaint. Defendant Osorio was a principal in an illegal distribution under Section 5(a) and (c) and, at the very minimum was an aider and abettor to fraudulent activity in violation of Section 17(a) and Rule 10(b) (5).

■ 6. As indicated by the findings of fact, defendant Nashwood pledged 66,666 unregistered shares of NBL stock which it had acquired from the issuer, thus making Nashwood liable as an underwriter in violation of Section 5(a) and (c) and pledged additional shares of NBL as collateral for a loan which also made it an underwriter. Further Nashwood on at least two occasions purchased NBL stock from Ling & Co. to help the market maker manipulate the price of the stock, thus becoming an aider and abettor to fraudulent conduct in violation of Section 17(a) and Rule 10(b) (5).

■ 7. As indicated in the findings of fact, defendant South Atlantic Co. pledged unregistered shares of Ric. At this time South Atlantic Co., controlled Ric, thus making South Atlantic Co. an issuer in violation of Section 5(a) and (c). Further South Atlantic Co. on at least one occasion purchased NBL stock from Ling & Co. to help the market maker manipulate the price of the stock, thus becoming an aider and abettor to fraudulent conduct in violation of Section 17(a) and Rule 10(b) (5).

■ 8. As indicated in the findings of fact, defendant Hoover, on behalf of South Atlantic Co. and, in part, on behalf of himself, pledged a large number of shares of unregistered Ric stock. As to the shares he pledged for himself, he was an underwriter, having taken them from an issuer (South Atlantic Co.) and as to those pledged for South Atlantic Co. he was an aider and abettor to a distribution. Further, defendant Hoover pledged shares of NBL as collateral for a loan and in so doing also was an underwriter. All these acts are in violation of Section 5(a) and (c). Further, he bought shares of NBL to help the market maker manipulate the price of the stock, thus becoming an aider and abettor to fraudulent conduct in violation of Section 17(a) and Rule 10(b) (5).

■ 9. As to defendant Carr, he has admitted being a control person of

SAC and in City Bank & Trust. Further, he owned sufficient interest in Nashwood (15%) to make a control person in that company and he was a control person in Dallas Bank & Trust because of the fact that he was a control person in SAC which owned Dallas Bank. However, he has denied detailed knowledge of the operations of any of these entities. SAC and Nashwood have both been found to have violated Sections 5 and 17 of the 1933 Act and Section 10 of the 1934 Act and the two banks have entered consent decrees. The SEC, however, has introduced insufficient evidence to hold defendant Carr liable as an aider and abettor to any individual violations by these companies. Additionally, Carr has denied any intent to participate in a conspiracy or any knowledge that one existed. As indicated previously, intent is immaterial; however, the SEC has the burden to establish that Carr had some general awareness that any acts he committed were necessary to the furtherance of an improper plan before he may be deemed an aider and abettor to any scheme. Even though Carr was intimately involved in a financial empire linked to defendant Sharp, the SEC has introduced insufficient evidence to establish that he was a knowing aider and abettor of a conspiracy or scheme. Further, no evidence was introduced to establish that he personally sold or pledged unregistered stock or that he personally violated the fraud sections.

Prior to closing, some observations are due regarding the general approach to the suit by plaintiff Securities & Exchange Commission. It is always possible in a complex lawsuit that a party may become unable to see the forest for the trees. That appears to be the situation in the instant case with the SEC. The SEC has brought suit against a number of defendants that allegedly committed a wide variety of acts. The SEC has sought to paint them all with the same broad brush—claiming that the various activities have made each defendant part of a conspiracy to sell unregistered stock and part of a scheme to defraud. Because of this alleged combined activity, the SEC sought to hold them all jointly liable. In so doing, the SEC, however, failed to distinguish one defendant from the other and failed to properly delineate individual violations. Thus, in its rush to establish joint liability it failed to lay proper groundwork for its case. It is hoped that in the final hearing on the permanent injunction the SEC will first offer testimony with reference to individual violations before offering testimony relative to a scheme or conspiracy.