**NORTHWAY, INC., a Delaware corporation, Plaintiff, et al., Intervening Plaintiffs,**

**v.**

**TSC INDUSTRIES, INC., a Delaware corporation, et al., Defendants.**

**No. 69 C 2513.**

United States District Court,
N. D. Illinois, E. D.

May 21, 1973.

Arnold I. Shure, Stanley B. Block, Vedder, Price, Kaufman & Kammholz, Alex Elson, Elson, Lassers & Wolff, Professor Harry B. Reese, Northwestern Law School, Chicago, for Northway.

Edwin Rothschild, Rothschild, Barry & Myers, Joseph N. Morency, Jr., Price, Cushman, Keck, Mahin & Cate, Chicago, Ill., for National Industries and TSC.

Robert B. Fiske, Jr., Davis, Polk & Wardwell, New York City, Max E. Wildman, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for Charles Schmidt, and others.

Barry B. Nekritz, Chicago, Ill., for Burton Abrams, and others.

## MEMORANDUM OPINION AND ORDER

McLAREN, District Judge.

This matter arises upon plaintiff's motion for partial summary judgment of liability against the corporate defendants[1] (referred to as "defendants" in Part I below) and the Schmidt defendants' motion for certification pursuant to Fed.R.Civ.P. 54(b) of the order of September 28, 1972,[2] granting summary judgment on Count III of the amended, restated and supplemented complaint.

### I.

There is no substantial factual dispute as to the following background. In early 1969, defendant National purchased the Schmidt defendants' interest in TSC, comprising approximately 34% of its outstanding equity securities. After consideration by the TSC board, a proxy statement dated November 12, 1969, (hereinafter referred to as "the joint proxy statement") was sent to the TSC shareholders proposing that TSC sell its assets to National, and be liquidated (referred to below as "the transaction"). Sufficient proxies were received for the approval of the proposal.

Plaintiff's instant motion is confined, without waiver of the other charges of the complaint, to alleged violations of § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and the rules promulgated thereunder, in the joint proxy statement. The alleged violations for which plaintiff seeks partial summary judgment as to liability fall into three categories:

A. The inadequacy of disclosure of National's relationship to TSC's management and directors.

B. The misrepresentation of the TSC directors' approval of the transaction.

C. The non-disclosure of facts which would have made the emphasis on market quotations not misleading.

### A.

1. Plaintiff first contends that the failure to disclose the change in control of TSC, which had previously been reported to the Securities & Exchange

---

1. TSC Industries, Inc. ("TSC"), National Industries, Inc. ("National"), and TS Liquidating Company.

2. Attached hereto as an appendix.

Commission ("SEC"), "constituted a *per se* violation of Rule 14a–3," 17 C.F.R. § 240.14a–3.

Rule 14a–3(a) provides that:

"No solicitation subject to this regulation shall be made unless each person solicited is concurrently furnished or has previously been furnished with a written proxy statement containing the information specified in Schedule 14A."

Schedule 14A, Item 5, requires:

"(e). If to the knowledge of the persons on whose behalf the solicitation is made a change in control of the issuer has occurred since the beginning of the last fiscal year, state the name of the person or persons who acquired such control, the basis of such control, the date and a description of the transaction or transactions in which control was acquired and the percentage of voting securities of the issuer now owned by such person or persons."

Plaintiff contends that the joint proxy statement should have stated the conclusion of change of control. As evidence that National was in control of TSC, plaintiff points to one document sent by National and two sent by TSC to the SEC stating that National could be "deemed to be a 'parent' of TSC as that term is defined in the Rules and Regulations under the Securities Act of 1933." Rule 405(n), 17 C.F.R. § 230.405(n), under the 1933 Act, defines a parent as an affiliate "controlling" a person.

Defendants assert that National was not, in fact, in control of TSC within the meaning of Item 5(e), notwithstanding the statements to the contrary in the SEC filings. Rule 12b–2(F), 17 C.F.R. § 240.12b–2(F), under the 1934 Act, and therefore relating to Item 5(e), defines control as "the possession . . . of the power to direct or cause the direction of the management of a person. . . ." Defendants point to the affi-

davit of Richard Shaefer, the president of TSC, and certain deposition testimony by him and by Stanley Yarmuth, who was chairman of the board of TSC and president of National at the time of merger, as evidence that National lacked the power to direct or cause the direction of TSC's management. The affidavit and deposition testimony show that Shaefer managed TSC without consulting with or answering to National. This creates an inference, to which defendants are entitled in opposing a motion for summary judgment, that National was not in control of TSC.

Plaintiff cites Mills v. Electric Auto-Lite Co., 403 F.2d 429, 434 (7th Cir. 1968), rev'd on other grounds, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), for the proposition that evidence such as that presented by defendants does not preclude summary judgment. The Seventh Circuit held that evidence of the independence of management did not "meet the point presented." The point there was whether the proxy statement was otherwise materially misleading in violation of Rule 14a–9, 17 C.F.R. § 240.14a–9. The situation here is different; such evidence does meet the issue of control presented here by plaintiff's 14a–3 theory.

Thus, viewing the evidence and the inferences therefrom in the light most favorable to defendants, the Court holds that plaintiff has failed to establish the absence of a genuine question of fact as to the material issue of whether National was in control of TSC. Plaintiff's motion for partial summary judgment of liability is accordingly denied as to the Rule 14a–3 ground.[3]

■ 2. Plaintiff also seeks summary judgment of liability on the ground that the joint proxy statement failed, in violation of Rule 14a–9, to adequately disclose the relationship between National and TSC. To establish a violation, plaintiff must prove (a) that the joint

---

3. The Court has solicited the opinion of the SEC as to whether, if it is shown at trial that National was in control, the

joint proxy statement sufficiently disclosed the change of control to satisfy Item 5(e) of Schedule 14A.

proxy statement falsely or misleadingly described the relationship or omitted facts necessary to make the description not false or misleading and (b) that the misstatement or omissions were material in the sense that they "might have been considered important by a reasonable shareholder who was in the process of deciding how to vote." *Mills*, 396 U.S. at 374, 90 S.Ct. at 621. To establish liability plaintiff must show the additional element of causation. Causation is not disputed here because defendants have admitted in their answer and in response to a request to admit that proxies necessary to the approval of the transaction were obtained from TSC shareholders by the joint proxy statement. *Id.* at 384, 90 S.Ct. 616, 621.

■ The pivotal question as to plaintiff's motion for summary judgment on this ground is thus whether certain facts relating to the relationship between TSC and National which were omitted from the joint proxy statement were, as a matter of law, material. To meet its burden, plaintiff must show that the facts withheld were so obviously important to TSC shareholders that reasonable minds could not differ on the question of whether the shareholders might have considered them important. Gould v. American Hawaiian S. S. Co., 331 F.Supp. 981, 986 (D.Del.1971); Beatty v. Bright, 318 F.Supp. 169, 173 (S.D.Iowa 1970); Berman v. Thompson, 312 F.Supp. 1031, 1034 (N.D.Ill.1970).

Of course, insofar as plaintiff seeks to impose liability for the joint proxy statement's failure to specify that National was in control of TSC, its motion must be denied because of its failure to show the absence of a question of fact as to control.

■ 3. Plaintiff also seeks partial summary judgment on the grounds that the previous *claims* of control made to the SEC should have been disclosed to make the recommendations of the transaction by the TSC management and board of directors not misleading.

Pages six and seven of the joint proxy statement set forth under separate headings the approval and recommendations of the National and TSC boards of directors, National's equity interest in TSC and how it was acquired, and National's nominees on TSC's board.

Plaintiff argues that, despite the disclosure of National's equity interest and nominees, the previous claims of control made to the SEC might have been considered important by TSC shareholders faced with the TSC board's recommendation because all except one of the directors who were stated not to be affiliated with National were employees of TSC and thus subject to National's claimed power to direct or cause the direction of TSC's management.

Plaintiff also attacks on the same theory the statement in the covering letter to the shareholders that "management urges you to mark your proxy FOR this purchase of TSC assets. . . ." The allegedly misleading effect of the failure to disclose the prior claims of National's power to direct TSC's management is claimed to have been aggravated by the failure to state that Stanley Yarmuth, the chief executive officer of National, was TSC's chief executive officer as chairman of its board and that Charles Simonelli, executive vice-president of National, was chairman of TSC's executive committee.

Plaintiff relies principally upon the Seventh Circuit's *Mills* decision, *supra*; Swanson v. American Consumer Industries, Inc., 415 F.2d 1326 (7th Cir. 1969); and Colonial Realty Corp. v. Baldwin-Montrose Chem. Co., 312 F. Supp. 1296 (E.D.Pa.1970), in support of its claim that the disclosure of National's relationship to TSC was inadequate under Rule 14a-9.

The *Mills* opinion (403 F.2d at 434) and *Swanson* (415 F.2d at 1330) which relied upon it, establish that the TSC board and management were not free to state their recommendations favoring the transaction without giving similar emphasis to the relationship between

them and National. In *Mills*, the court of appeals considered several factors in reaching its determination that the proxy failed, as a matter of law, to adequately bring out the relationship between the Auto-Lite board and Mergenthaler. The Court noted that greater emphasis was given to the Auto-Lite board's recommendation of the merger, through larger and heavier type and placement near the beginning of the proxy statement, than to Mergenthaler's ownership of 54% of the Auto-Lite stock, the number and positions of Mergenthaler nominees on Auto-Lite's board, the fact that all Auto-Lite directors would be on the board of the new corporation, and that two of the Auto-Lite directors who also were directors of Mergenthaler and a third corporation, American, had claimed in a SEC hearing that American controlled the operations of Mergenthaler and Auto-Lite, that seven of Auto-Lite's directors were nominees of Mergenthaler, and that the four remaining Auto-Lite directors were "kept" because of their understanding of the company and their positions in the community. 403 F.2d at 433–34.

In *Swanson*, decided under Rule 10b–5 rather than 14a–9, Peoria's board recommended that its stockholders vote in favor of the reorganization plan, but failed to disclose that the other party to the bargain, ACI, was the parent of U.S. Cold which it was disclosed would vote its 87% of the shares of Peoria for the sale, and that the board was composed solely of ACI officers and directors. Based upon this concealment of the board's conflict of interest, the failure to provide an appraisal value for Peoria's assets, the statement that the Peoria stock was relatively worthless, and the concealment of ACI's plan to exploit a corporate opportunity of Peoria, the court concluded that the proxy statements were misleading in material respects and deceptive as a matter of law. 415 F.2d at 1330–31.

*Baldwin-Montrose* is a difficult decision. The court there concluded that the joint proxy statement's failure to state that Baldwin-Montrose believed that it had clearly obtained working control of Chris-Craft (which had been stated in an SEC hearing) entitled plaintiff to summary judgment on the issue of liability under §§ 10(b) and 14(a). The *Mills* test for violations of Rule 14a–9 was recited, but no explanation of how the failure to state Baldwin-Montrose's belief made the statements in the proxy statement false or misleading was given. Although the court concluded that the defect was of such a character that it might have been considered important by a reasonable shareholder in the process of deciding how to vote, there was no finding that reasonable minds could not differ on this issue. Further, the court certified its order pursuant to 28 U.S.C. § 1292(b) as involving a controlling question of law as to which there was a substantial ground for difference of opinion. No decision on appeal has been reported, however.

Unlike the proxy statement dealt with in *Mills*, the joint proxy statement complained of here gives similar emphasis to the board's recommendation, National's equity interest in TSC, and the number and some of the positions of National's nominees. If the TSC shareholders were misled as to National's relationship to TSC, the circumstances under which this occurred can hardly be compared to the total concealment of the conflict of interest in *Swanson*. The failure to disclose the prior claim of control for which plaintiff seeks to impose liability was only one of the factors considered in *Mills*; it is not clear that the *Mills* court would have held the proxy statement to be in violation of Rule 14a–9 based solely on this omission. The conclusion reached in *Baldwin-Montrose* supports plaintiff's theory, but the lack of analysis, the failure to find that reasonable minds could not differ on the issue of materiality, and the court's willingness to certify the issue for appeal deprive that opinion of much of its value as precedent.

It has been recognized that "[i]t is easy to find small errors and trivial

omissions in any proxy statement. . . ." Allen v. Penn Central Co., 350 F.Supp. 697, 702 (E.D.Pa.1972). In passing on plaintiff's motion for partial summary judgment, the Court has considered the omitted facts in light of the manner in which other facts were disclosed which could have alerted the TSC shareholders to the possible bias of the management and board of TSC. *Cf.* Kohn v. American Metal Climax, Inc., 458 F.2d 255, 267 (3d Cir. 1972). While the Court believes that the prior claims of control made to the SEC and Yarmuth's and Simonelli's other positions might have been considered important by TSC shareholders, it cannot conclude that these facts were so obviously important to them that reasonable minds could not differ on the issue; that is, as to whether they would have a significant propensity to affect the voting process. *Mills*, 396 U.S. at 384, 90 S.Ct. 616, 24 L.Ed.2d 593. Accordingly, the motion is denied as to this ground.

### B.

■ Plaintiff contends that the statement in the joint proxy statement that the TSC board of directors had approved the transaction was false, in violation of Rule 14a–9. It is admitted that the resolutions to approve the plan of sale, liquidation, and dissolution of TSC were presented to the board at a meeting attended by eight of the ten directors. It is further admitted that directors Noyes, Schaefer, DeForest, and Sharfman voted for the resolutions, that there were no negative votes, and that the remaining directors in attendance, Yarmuth, Solomon, Segell, and Peterson, did not vote. Plaintiff claims that because the transaction included the dissolution of TSC, its approval required "the adoption of a resolution to that effect by a majority of the whole board . . ." as set forth in § 275(a) of the Delaware Corporation Law, 8 Del.C. § 275(a). Defendants argue that § 144, which deals with the validity of the acts of directors where some have adverse financial interests or corporate duties, su-

percedes § 275 in this situation. Section 144 reads, in pertinent part:

"(a) No contract or transaction between a corporation . . . and any other corporation . . . in which 1 or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board . . . which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

(1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors . . ., *and the board . . . in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum. . . ."* (emphasis added)

Assuming for the purpose of this motion that directors Noyes, Schaefer, DeForest, Sharfman and Peterson were disinterested, plaintiff asserts that § 144, if it is applicable, was not satisfied. Plaintiff contends that the proper procedure would have been for at least two other directors to have voted for the transaction even though they were interested. Defendants, on the other hand, read § 144 so as to make the votes of interested directors irrelevant so long as a majority vote of the disinterested directors is obtained. There are no reported decisions dealing with the recent amendments to § 144 at issue here. A noted commentator, cited by the parties on both sides, gives the following example of the application of § 144 which supports defendants' view:

"Thus, if three of four disinterested directors on a nine-man board vote for

the transactions, it is validated. In this hypothetical, it is assumed that the five interested directors (who are permitted under these [Delaware] statutes to participate in and vote at the meeting) would have voted for the transaction, so that the resolution formally passes by a vote of eight to one."

Folk, Corporation Law Developments– 1969, 56 Va.L.Rev. 755, 782 (1970). See also Arsht & Stapleton, Delaware's New General Corporation Law: Substantive Changes, 23 Bus.Law. 75, 81 (1967). In the absence of contrary precedent, this construction appears to be reasonable and will be adopted here.

Plaintiff argues that § 144 is inapplicable by its terms to dissolution because it is a unilateral action rather than a contract or transaction between the corporation and others. This technical construction would not serve the apparent intent of the Delaware legislature to abrogate the common law rule of voidness of corporate action where interested directors are present or participate in board meetings. To adopt plaintiff's construction would mean that at least one of the interested directors on the TSC board would have had to make the useless gesture of voting for the transaction when it can be assumed, as in Professor Folk's example, that all of National's nominees would have so voted.

The Court concludes that plaintiff has failed to show that the transaction was not validly approved by the TSC board and accordingly denies its motion for partial summary judgment of liability on that ground.

### C.

Plaintiff contends that the joint proxy statement's emphasis on market quotations for the securities to be exchanged was materially misleading as a matter of law under Rule 14a–9, in light of certain undisclosed facts.

TSC shareholders were offered one-half share of National's Series B cumulative preferred stock and one and one-half National warrants for each of their shares of TSC common and .6 share of National's Series B cumulative preferred stock and one National warrant for each of their shares of TSC Series 1 preferred. Each full share of the National preferred was convertible into .75 share of National common, and each National warrant entitled the holder to purchase one share of National common for $21.-40.

On page 10 of the joint proxy statement, in compliance with Item 14(c) of Schedule 14A, the high and low sale prices of National's common stock, Series B preferred stock, and warrants, and TSC's common stock and Series 1 preferred stock for each quarterly period in the preceding two years is set forth. Plaintiff contends that the significance of these market quotations could not be fairly evaluated without disclosure of the fact that National and Madison Fund, Inc. ("Madison") purchased 260,000 shares of National common in 1968 and 1969. Essential to plaintiff's theory is its contention that the purchases by Madison and National were coordinated. It is not disputed that the chairman of National's board of directors, Bernard Barnett, was also a director of Madison and that the president and a director of Madison, Edward Merkle, was employed by National at the time the joint proxy statement was mailed, for $12,000 per year, for performing such duties as requested by National's board for at least one day each month. It has been shown that Merkle consented (solely for the purposes of settlement) to the entry of an order by the SEC finding that he willfully violated and aided and abetted violations of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, and §§ 17(a)(3), 17(d), and 48(a) of the Investment Company Act, 15 U.S.C. §§ 80a–17(a)(3), 80a–17(d), 80a–47, and Rule 17d–1, 17 C.F.R. § 270.17d–1, thereunder. This was based in part on the finding that Merkle caused Madison to

purchase 182,500 shares of National common and National convertible bonds in the amount of $2 million without disclosing that he was a salaried employee of National, had National common stock and stock options in his personal portfolio, and sold at least 8,100 shares of National *common during the period of* Madison's purchases. In re Merkle, SEC Investment Co. Release No. 7280 (July 19, 1972).

As further evidence that the Madison and National purchases were coordinated, plaintiff notes that neither ever made purchases in the same week as the other and that Madison's purchases "were made at times of substantial benefit to National," such as when the market price of National common was used to fix the exchange ratios in other acquisitions.

In opposition, defendants point to the lack of evidence of any significant purchases of National preferred stock or warrants by National or Madison, the lack of evidence of the relationship of the market price of the National common to the preferred and the warrants, the lack of evidence of purchases by National in the period immediately prior to the mailing of the joint proxy statement, and the lack of evidence that National's and Madison's purchases had any material effect on the market price of National common at the dates given in the joint proxy statement. Defendants also assert, and support with affidavits and deposition testimony, that Yarmuth, Solomon, and Barnett only learned of Madison's purchases of National common after they took place.

Although plaintiff's evidence shows the opportunity for coordination, and the inference that might be drawn from its evidence might support a finding of coordination, the Court is not free to draw such inferences. Thus, defendants' evidence succeeds in raising a genuine issue of fact as to whether the Madison purchases were coodinated with National's. Plaintiff does not argue or cite authority showing that defendants had a duty to disclose Madison's purchases if they were simply aware of, but did not cause, the purchases. Accordingly, plaintiff's motion is denied as to its contention that the purchases of National common by Madison and National should have been disclosed in connection with the market quotations.

Plaintiff also claims that the statement on page 6 of the joint proxy statement that the favorable opinion as to the fairness of the transaction of Hornblower & Weeks-Hemphill, Noyes was based in part upon "the substantial premium over current market values represented by the securities being offered to TSC shareholders. . . ." This assertion is based, first, on the failure to disclose that Hornblower's opinion was predicated on a value of $3.50 each for the warrants, rather than the $5.25 current market price given in the joint proxy statement, and the condition that National retire $13 million of its debt. As to the latter factor, the sentence from which the allegedly misleading statement is taken also includes the statement that the debt service requirements of TSC and National were considered in reaching the opinion. Plaintiff bases its criticism of the failure to disclose that Hornblower relied upon a warrant value of $3.50 on its assertion that the use of this figure results in a very small premium, rather than the substantial one claimed. There is no evidence in the record of which the Court is aware to support this assertion. The truth of this assertion and the adequacy of the disclosure of the condition remain to be determined by the finder of fact and summary judgment on these grounds is thus precluded.

■ Finally, plaintiff asserts that the statement that Hornblower relied upon a premium over current market values constituted an implicit prediction as to future market values, in violation of Rule 14a–9, as exemplified in Note 1 to the Rule. Note 1 deals, however, with "specific" future market values which clearly were not predicted here.

This is certainly not the same type of situation as in Union Pac. R. R. v. Chicago & N. W. Ry., 226 F.Supp. 400, 409 (N.D.Ill.1964), upon which plaintiff relies, where the Northwestern represented that a savings of $25 million was anticipated from a merger and that the value of the package offered by the Northwestern "should reach well above forty dollars per share" as compared with much less for a competing exchange offer. The Court concludes that the implicit prediction of post-transaction market values here should be governed by the usual standards under Rule 14a–9 rather than upon what would amount to a *per se* test based upon Note 1 to the rule. Accordingly, as plaintiff has failed to show that the implicit prediction was materially misleading as a matter of law, its motion is denied as to this ground.

## II.

As the Schmidt defendants correctly point out, this Court's memorandum opinion and order dated September 28, 1972, disposed of the only count in which they are named and in which relief is prayed against them. The Court cannot conclude, however, that there is no just reason for delay in the entry of a final judgment as to that count.

In his often-quoted opinion in Panichella v. Pennsylvania R. R., 252 F.2d 452, 455 (3d Cir. 1958), Judge Hastie noted that Rule 54(b) was adopted to authorize "the exercise of a discretionary power to afford a remedy in the infrequent harsh case [citation omitted]." The only hardships to which the Schmidt defendants claim they will be subjected if plaintiff is not forced to appeal is the additional delay and expense of "sitting through what will obviously be a long and protracted trial against . . . [the corporate defendants]." This is hardly the infrequent harsh case; rather, the inconvenience of which the Schmidts complain is experienced in any case where one or more defendants prevail upon their motions to dismiss or for summary judgment prior to the trial of their codefendants. An appeal of the order granting the Schmidt defendants' motion for summary judgment would only serve to delay the trial of the claims against the corporate defendants by diverting plaintiff's attorneys' energies. Because plaintiff's claims against the Schmidts depend to some extent upon the liability of the corporate defendants, the court of appeals will be presented with a more concrete record upon which to evaluate the propriety of the order of September 28 if the appeal of that order follows the trial of the remaining issues. The Schmidt defendants have failed to show that the circumstances of this case demand that the strong policy against piecemeal appeals in this circuit, e.g., Columbia Broadcasting Sys., Inc. v. Amana Refrigeration, Inc., 271 F.2d 257, 258 (7th Cir. 1959), cert. denied, 362 U.S. 928, 80 S.Ct. 756, 4 L.Ed.2d 747 (1960), be disregarded in this instance.

Accordingly, the motion of the Schmidt defendants is denied.

It is so ordered.

## APPENDIX

This matter is now before the Court on the motion of defendants Charles E. Schmidt, Dorothy F. Schmidt, Richard L. Schmidt, Charles E. Schmidt, Jr., and the Charles E. Schmidt and Dorothy F. Schmidt Family Foundation (hereinafter "the Schmidt defendants") for summary judgment or, in the alternative, for dismissal as to them of Count III of the amended, restated and supplemental complaint, and on plaintiff's cross motion for summary judgment on said count.

In early 1969 defendant National Industries, Inc. (hereinafter "National") purchased the Schmidt defendants' shares of stock in defendant TSC Industries, Inc. (hereinafter "TSC"). In December 1969, pursuant to a shareholder-

approved joint proxy statement, the assets of TSC were transferred to National with the TSC shareholders receiving National equity securities in exchange for their shares.

Counts I and II allege fraudulent misstatements and omissions by National and others in the proxy statement in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5, § 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), and Regulation 14A thereunder, 17 C.F.R. § 240.14a–1 et seq.

Count III charges the Schmidt defendants with violations of § 10(b) and Rule 10b–5, as well as aiding and abetting the other defendants' violations of the securities laws.

Even construing them in the light most favorable to plaintiff, it is clear that some of the "wrongful acts" alleged to have been performed by the Schmidt defendants fail to state a claim and will therefore be stricken. Paragraph 15(a) of Count III alleges that these defendants failed to have included, or attempt to have included, in the agreement by which they sold their shares any provision to insure that National would not acquire the remaining interests in TSC, except at a price and on terms at least as favorable as those accorded the Schmidt defendants. The only case which plaintiff cites in support of a claim for relief on this basis is Percodani v. Riker-Maxson Corp., 50 F.R.D. 473, 475, 478 (S.D.N.Y.1970) where such a provision was contained in the sale agreement. But neither *Percodani* nor any other case of which this Court is aware has held that the seller of a controlling interest in a corporation (as the plaintiff alleges the Schmidt defendants are) is subject to liability for failing to insist on such a clause. Indeed, such a holding would contradict the rationale behind cases which have held that controlling shareholders may lawfully sell their interests at a premium above the market price and need not even notify the other shareholders or the public. Dasho v. Susquehanna Corp., 461 F.2d 11, 32–33 (7th Cir. 1972); Haberman v. Murchison, 331 F.Supp. 180, 188–89 (S.D.N.Y.1971); Christophides v. Porco, 289 F.Supp. 403, 405 (S.D.N.Y.1968).

Paragraph 15(b) charges these defendants with failing to insist that the sale agreement contain a provision insuring that National would not use its control of TSC to its own advantage and to the detriment of TSC and its other shareholders. As with 15(a), plaintiff has not cited any authority supporting this claim. The Court does not believe that Rule 10b–5 goes so far as to require that the controlling shareholder must insist that the buyer of control promise not to do what is already improper under the securities laws and the common law. Such a clause would add little to the remedies available for such conduct even if it were enforceable. Accordingly, subparagraphs 15(a) and (b) will be stricken.

Subparagraphs 15(c), (d) and (e) allege that the Schmidt defendants, by negligently transferring their control, aided and abetted National in acquiring the remaining ownership of TSC for a fraudulently low consideration and at a price and on terms substantially less favorable to TSC's remaining shareholders than those accorded the Schmidt defendants.

These allegations state a claim under which plaintiff could conceivably prove a set of facts entitling it to relief under Rule 10b–5. Defendants' motion to dismiss cannot, therefore, be granted as to these allegations.

The questions presented by the cross motions for summary judgment are (1) whether there is a genuine issue as to any material fact and (2) if there is none, which party is entitled to judgment as a matter of law.

Plaintiff has not presented by affidavit or otherwise any evidence that the Schmidt defendants intentionally aided

and facilitated National's allegedly fraudulent control over TSC, or participated in any conspiracy to that end with National. Thus, Shell v. Hensley, 430 F.2d 819, 827 n. 13 (5th Cir. 1970); Herpich v. Wilder, 430 F.2d 818, 819 (5th Cir. 1970), cert. denied, 401 U.S. 947, 91 S.Ct. 935, 28 L.Ed.2d 230 (1971); Herpich v. Wallace, 430 F.2d 792, 797–798 (5th Cir. 1970); Dasho v. Susquehanna Corp., 380 F.2d 262, 267 n. 2 (7th Cir. 1967); and Vine v. Beneficial Finance Co., 374 F.2d 627, 630 (2d Cir. 1967), upon which plaintiff relies, are inapposite. In all of those cases, the sellers of control were shown or alleged to have conspired with the buyers to defraud their corporations.

Plaintiff also relies on three Seventh Circuit decisions to support its theory that the Schmidt defendants are jointly liable with National for aiding and abetting its allegedly fraudulent acquisition of the remainder of TSC. In SEC v. First Securities Co. of Chicago, 463 F.2d 981 (7th Cir. 1972) a broker-dealer was held jointly liable under Rule 10b–5 for the fraudulent activities of its president because it held him out as a successful investment counselor and then wilfully allowed him to enforce a rule forbidding anyone but himself to open his mail, without which his fraudulent activities would have been discovered. In Brennan v. Midwestern United Life Ins. Co., 417 F.2d 147, 155 (7th Cir. 1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970), it was held that a corporation was liable as an aider and abettor for not reporting a broker to the Indiana Securities Commission and the federal Securities and Exchange Commission after it learned that he was dealing fraudulently with his customer's orders for the corporation's stock. The court in Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135 (7th Cir.), cert. denied, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969),

held that a broker-dealer would be liable as an aider and abettor for 10b–5 violations by its customer where its failure to observe the New York Stock Exchange "Know Your Customer" rule resulted in allowing the customer to continue dealing in securities through a cash account despite his financial instability and erratic trading practices. In each of these cases, vicarious liability was imposed where there were circumstances which created a duty to recognize and report that another's acts were, or were likely to become, fraudulent. In *First Securities* it was the mail rule, in *Brennan* it was customer complaints, and in *Buttrey* it was the Exchange rule. These cases bring the central issue raised by the cross motions into focus: should the Schmidt defendants have foreseen that National was likely to use its control of TSC fraudulently?

The record in this case contains no proof of circumstances surrounding the sale of the Schmidt defendants' interest which should have put them on notice that National was likely to deal fraudulently with TSC and the other shareholders. The investigation of National and its management which Charles E. Schmidt, Sr. conducted to evaluate National's offer showed at most that National was a conglomerate firm with the declared intent to continue to seek to acquire the complete ownership of other businesses in the future. In its brief, plaintiff asserts that the Schmidt's negligence was in their failure to further investigate National. Although it was decided on the basis of fiduciary duty rather than Rule 10b–5, Insuranshares Corp. v. Northern Fiscal Corp., 35 F. Supp. 22 (E.D.Pa.1940), is instructive. There the court recognized that the owners of control have no duty to investigate prospective buyers until "the circumstances surrounding the proposed transfer are such as to awaken suspicion [that fraud is intended or likely to re-

sult]." *Id.* at 25. This is the same approach used in the Seventh Circuit cases discussed above, where the likelihood of fraud was, or should have been, apparent in each case. Since, as is indicated above, there is no evidence here of such circumstances to arouse the Schmidts' suspicions, the duty to investigate did not come into play. See also Essex Universal Corp. v. Yates, 305 F.2d 572, 576–577 (2d Cir. 1962).

Even assuming *arguendo* that the Schmidt defendants negligently failed to further investigate National before selling their interests, plaintiff has not pointed to any evidence showing that such an investigation would have revealed facts giving them cause to believe that National would exercise control of TSC fraudulently. Without such evidence, plaintiff fails to sustain its burden of showing that the failure to investigate in some way contributed to National's alleged conduct. See Securities & Exchange Comm'n v. National Bankers Life Ins. Co., 324 F.Supp. 189, 195 (N.D.Tex.), aff'd, 448 F.2d 652 (5th Cir. 1971).

Although issues of negligence cannot ordinarily be disposed of by summary judgment (Gross v. Southern Ry., 414 F.2d 292, 296 (5th Cir. 1969)), it is appropriate here. Plaintiff's failure, after prolonged discovery, to come forward with evidence showing the negligence of the Schmidt defendants to support its claim that they violated Rule 10b–5 and aided and abetted National's violations leads this Court to conclude that there is no genuine issue as to the material facts of the Schmidts' alleged negligence and their claimed contribution to National's alleged conduct. With no genuine issue as to these facts, the Court holds that the defendants are entitled to judgment. Accordingly, summary judgment will be entered in favor of the Schmidt defendants and against plaintiff.

It is so ordered.