**Billie Jean WOODWARD,
Plaintiff-Appellant,**

v.

**METRO BANK OF DALLAS et al.,
Defendants-Appellees.**

**No. 74–2897.**

United States Court of Appeals,
Fifth Circuit.

Nov. 3, 1975.
Rehearing Denied Nov. 28, 1975.

Frank G. Newman, Lawrence G. New-man, Dallas, Tex., for plaintiff-appellant.

Hubert D. Johnson, H. Dee Johnson, Jr., Dallas, Tex., for Metro Bank and others.

Before CLARK,* Associate Justice, and GOLDBERG and AINSWORTH, Circuit Judges.

GOLDBERG, Circuit Judge:

This case brings before us the unfortunate predicament of one who claims she was defrauded in connection with the purchase and sale of a security and who accordingly seeks to invoke the broad, but not unbounded, protection of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970), and its implementing Rule 10b–5, 17 C.F.R. § 240.10b–5 (1975).[1] This is not a difficult case decisionally, but it is thicketed with explicatory thorns. We must be certain that neither all commercial banking transactions, nor accommodation loans, nor notes are beyond the pale of 10b–5's strictures. We must interpret the Act so that financial ingenuity cannot overrun the legitimate scope of its coverage. The district court, after a full trial, dismissed plaintiff's suit for want of jurisdiction, holding that a ninety-day

---

* Hon. Tom C. Clark, Associate Justice of the Supreme Court of the United States (Retired), sitting by designation.

1. Rule 10b–5 prohibits the employment of manipulative and deceptive devices in the following language:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

note was exempted from the Exchange Act by section 3(a)(10), 15 U.S.C. § 78c(a)(10) (1970),[2] and that an ordinary commercial loan did not constitute a "sale" under the Act. Although we agree with the result reached by the court below, we affirm on different grounds, finding that plaintiff has failed to state a claim within the ambit of the securities laws.

## I. Factual Setting

The characters in this unhappy saga form a sort of Eternal Triangle. At one point is Billie Jean Woodward, the plaintiff, described as a recently divorced housewife with painfully little business acumen. E. Trine Starnes appears at the second point, once a successful businessman with a glowing future, president and controlling shareholder of Cosmetics International Corporation (CIC), and president of CIC's wholly owned subsidiary International Psycho-Cybernetics Corporation (IPC). Metro Bank of Dallas[3] and its officer Ron Turnbull complete the design. For a period of time from November 1972 to April or May 1973, Metro held the principal CIC accounts; then in April or May Metro asked CIC to change banks, because the account had proved unprofitable. Starnes also opened a personal account at Metro in November 1972. The record does not reflect when this relationship ended, aside from some testimony indicating it was after the termination of the corporation's account. Turnbull was the officer in charge of both accounts at all relevant times.

The brief liaison between Metro and CIC occurred during a period when the company was sinking into a financial position so grim that in August 1973 it declared Chapter XI bankruptcy. This tragic denouement, however, was still in the future at the time CIC opened its account at Metro, furnishing the bank with a pro forma financial statement dated September 30, 1972. The statement was adjusted to reflect $500,000 of long term debt assumed by CIC in October as if it had been received and disbursed as of September 30.[4] With this adjustment, the CIC balance sheet showed $401,960 cash in bank and on hand, $748,638 total current assets, and $1,564,314 total assets. Current liabilities equalled $499,825, which was $97,865 more than the cash on hand, but $248,813 less than current assets. Finally, the statement revealed a deficit retained earnings figure of $591,702. The income statement showed a positive total net income for the month of September of $40,538, but it showed a loss for the year to date of $150,715.

In November 1972, Metro loaned $45,000 to CIC. In December, it loaned an additional $47,000 to the corporation, for a total outstanding indebtedness of $92,000.[5] Throughout the brief history of the CIC account, the company was plagued with a fairly large number of insufficient fund (NSF) checks.[6] Turnbull testified that Metro did not extend overdraft privileges to CIC; rather, its practice was to contact the company whenever a check was returned and to request a deposit to cover the check.

---

2. Section 3(a)(10) provides in pertinent part that

> The term "security" means any note, . . . ., investment contract, . . . but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

3. Metro was formerly known as the City Bank & Trust Company; however, it will be referred to as Metro for all purposes here.

4. The $500,000 was disbursed as follows: $100,000 to Current Notes Payable, $200,000 to Trade Accounts Payable, and $200,000 to Accrued Payroll and Commissions. These facts were all disclosed on the front of the statement.

5. Both loans were secured by life insurance policies, according to defendant Turnbull's testimony.

6. Metro's records for December 1972 and January 1973 NSF checks appear to be missing; however, the February report backs the allegation of sizeable NSF occurrences.

Metro received transfers to CIC's account from nearly forty other banks located around the country; according to Turnbull, the NSF occurrences brought to his attention were covered by these transfers from other banks.

We now turn our attention to the development of the Starnes-Woodward relationship. These two met in December, 1972, when Starnes approached Mrs. Woodward to see if she wanted to purchase 25,000 shares of IPC stock from CIC. Falsely reporting that CIC's financial health was glowing, Starnes told Mrs. Woodward that no CIC stock was presently available, but that another person had loaned the corporation $500,000 with the understanding that he would be repaid with stock. At that time Mrs. Woodward bought the IPC shares for $50,000. On February 15, 1973, Starnes telephoned Mrs. Woodward and invited her to fly from San Antonio, her home, to Dallas to discuss CIC's business. She did so, and at a meeting on February 21 in Dallas, Starnes asked her to co-sign a note for $150,000 to provide "working capital" for CIC. He also suggested that she back the note with some Texaco and Timken stock worth $185,000 that she owned. In return for her assistance, Starnes promised to pay her $1250 per month during the life of the note in return for "counseling" services for CIC and IPC[7] and, as the trial court found, as compensation for her signature. Finally, Starnes asked her to serve on the Board of Directors of CIC. Starnes at no time disclosed to Mrs. Woodward the true facts of CIC's failing finances, the frequent NSF checks, or the outstanding $92,000 of loans from Metro.

The first time this triad converged was on February 28, 1973, when after some misgivings on Mrs. Woodward's part they met in Turnbull's office at Metro to conclude the loan transaction.[8] Mrs. Woodward then learned that Metro had decided to require a $200,000 loan, with $50,000 of the proceeds to be invested in a non-interest bearing certificate of deposit (CD). The note had a term of ninety days and bore an interest rate of 8.5%. The loan itself was to Starnes personally; the Statement of Purpose of the Proceeds of a Stock-Secured Extension of Credit by a Bank (Regulation U form)[9] stated that the proceeds would be used "to furnish working capital for Cosmetics International Corporation." (See Plaintiff's Exhibit 9.) Mrs. Woodward signed two security agreements, one pledging her stock as collateral and the other pledging the $50,000 CD against "all indebtedness now owing to [the bank] or which may hereafter become owing . . . ." This cross-collateral provision is significant because at the time, Starnes had two outstanding personal loans with Metro totaling $29,500. These were subsequently renewed in April, with a $5,000 reduction in principal, and again in July. Plaintiff does not discuss Starnes' personal finances, but according to Turnbull's testimony an investigation of his payment record at other banks revealed no adverse information. Immediately after the loan was consummated, Starnes transferred the $150,000 to the CIC account. That day, $90,000 of CIC's checks were paid.[10]

Mrs. Woodward received her checks for $1250 until June, when one was returned NSF. When in May the February 28 note became due for renewal, the bank asked Mrs. Woodward either to reduce the principal amount or to provide additional collateral, since the value of

---

7. The amount of time Mrs. Woodward was to devote to "counseling" was left completely to her discretion; she could, as in fact happened, render no services at all.

8. This was the first time Mrs. Woodward had met Turnbull.

9. See 15 U.S.C. § 78g (1970); 12 CFR §§ 221.1 et seq. (1975); Federal Reserve Form U–1.

10. Although the unaudited financials of CIC show that the company had a deficit net worth by December 31, 1972, nothing indicates that the bank was aware of this dismal situation. From that time onward, current liabilities exceeded current assets. See Plaintiff's Exhibits 31, 32, 33, 34, and 36.

her Texaco and Timken shares had fallen slightly. Reluctant to encumber her assets further, she chose instead to accept from Starnes twenty-five checks payable to Metro for $1,000 each, which she could use to reduce the note. Relying on this arrangement, on May 29 she signed a renewal note. Afterwards, she discovered that the checks from Starnes were drawn on an account held by a different Dallas bank with insufficient funds. In August 1973, Turnbull informed her that CIC had filed bankruptcy proceedings.[11] Since Starnes did not pay the renewed note when it became due, the bank turned to Mrs. Woodward to collect its funds. The $50,000 CD was used first to liquidate the earlier personal loans Starnes had outstanding. Applying the balance to the $200,000 note, Metro threatened to foreclose on the pledged securities unless Mrs. Woodward paid the remaining amount due.

## II. Resort to the Courts

Promptly reacting to Metro's demand for payment, Mrs. Woodward filed suit in the United States District Court on August 27, 1973, alleging federal jurisdiction under section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1970) for violations of section 10(b) of that Act, 15 U.S.C. § 78j(b) (1970) and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1975). She named Metro Bank, Starnes, and Turnbull as defendants. The complaint charges Starnes with devising a scheme to defraud her; it alleges that all defendants knew material facts about CIC's financial status and the use of the loan proceeds, but failed to disclose these facts, and it seeks to hold Metro and Turnbull as aiders and abettors. The promissory notes are alleged to be securities within the meaning of the Securi-

ties Exchange Act. The relief demanded in the complaint includes an injunction against foreclosure and sale of the stock, an order requiring Metro to return the shares to Mrs. Woodward, and cancellation of the note (or in the alternative, $200,000 plus interest).[12] Metro Bank and Turnbull answered, claiming lack of federal jurisdiction and failure to state a claim upon which relief could be granted, and specifically denying their connection to any fraud. Metro filed a state law counterclaim against Mrs. Woodward and a cross-claim against Starnes for judgment on the debt and foreclosure and sale of the stock.

Before this case came to trial, Metro and Turnbull twice filed motions to dismiss for want of federal jurisdiction, taking the position that the notes were not securities under section 3(a)(10) of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10) (1970), because the Act exempts notes with maturity not exceeding nine months. A fortiori, they argued that since no security was involved, there was no fraud in connection with the purchase or sale of a security, as required by Rule 10b–5. See note 1, supra. The district court denied the first motion in an order dated December 3, 1973, to allow plaintiff time to develop facts supporting jurisdiction through discovery. The court again denied defendants' Suggestion of Lack of Federal Court Jurisdiction on June 11, 1974, on grounds that sufficient jurisdiction existed to go to trial. Consequently, on June 13, 1974, the entire case came to trial. After a full trial on the merits, the district court announced it would dismiss the case against Metro, Turnbull, and Starnes based on the promissory notes for lack of jurisdiction,[13] without preju-

---

11. Apparently CIC filed under Chapter XI of the Bankruptcy Act.

12. The complaint also contains two counts purporting to invoke the pendent jurisdiction of the federal courts. Count Two alleges usurious interest in violation of Tex.Rev.Civ.Stat. Ann. art. 5069–1.06, and Count Three alleges fraud in a transaction involving the Texaco and Timken stock in violation of Tex.Bus.

Comm.Code § 27.01. We express no opinion as to the viability of these state law claims, since we find that the federal securities laws do not reach Metro here.

13. The original suit was against Metro, Starnes, and Turnbull. When the court announced that it intended to find no jurisdiction over the claim based on the promissory notes, plaintiff amended the complaint against

dice to state claims. The findings of fact and conclusions of law filed on June 18, 1975, cited as grounds for the court's decision the section 3(a)(10) exemption for notes payable in less than nine months and the commercial character of the transaction.

In this appeal, plaintiff argues that the scheme in which she placed her personal credit at risk and pledged $185,000 of her Texaco and Timkin stock—*i. e.* the promissory note she signed as an accommodation maker—was an "investment contract," and therefore a security for purposes of federal jurisdiction. The statutory exclusion for paper with a maturity of less than nine months, she argues, does not automatically divest the court's jurisdiction where the transaction is in fact for investment. Finally, she asserts that the pledge of stock was tantamount to a "sale," and therefore she was defrauded "in connection with" the purchase *or sale of a* security. Defendant-appellees' arguments stress the separability of the agreement between Starnes and Mrs. Woodward from the loan transaction between Metro and Starnes and Woodward. A commercial loan by a bank, they say, does not fall within the ambit of Rule 10b–5.

### III. The 10b–5 Claim

#### A. Notes as Securities

■ To place our ultimate discussion of Metro's liability in its proper context,

a brief review of this Court's current position on Rule 10b–5 seems appropriate. The generous remedial compass of the federal securities laws is well-known; countless cases have recognized the broad protection crafted by the courts from the securities legislation and the concomitant flexible approach attuned to economic realities. *E. g., United Housing Foundation, Inc. v. Forman*, 1975, 421 U.S. 837, 846–848, 95 S.Ct. 2051, 2057–2058, 44 L.Ed.2d 621, 629–30; *Tcherepnin v. Knight*, 1967, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564, 569; *SEC v. Capital Gains Research Bureau, Inc.*, 1963, 375 U.S. 180, 186, 84 S.Ct. 275, 279, 11 L.Ed.2d 237, 243; *Dupuy v. Dupuy*, 5 Cir. 1975, 511 F.2d 641, 643; *Smallwood v. Pearl Brewing Co.*, 5 Cir. 1974, 489 F.2d 579, 592, *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113; *Hooper v. Mountain States Securities Corp.*, 5 Cir. 1960, 282 F.2d 195, 201–02, *cert. denied*, 1961, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693.[14] Yet the very breadth of present 10b–5 law imposes a duty on the courts to evaluate a proposed expansion of the Rule's coverage in light of the facts and circumstances of the new case. *See Herpich v. Wallace*, 5 Cir. 1970, 430 F.2d 792; *accord, Clement A. Evans & Co. v. McAlpine*, 5 Cir. 1970, 434 F.2d 100, 103, *cert. denied sub nom. Clement A. Evans & Co. v. A. M. Kidder & Co.*, 1971, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153. The court must ask whether the conduct in the case before it was the type of behavior meant to be

Starnes to allege a separate claim based on a pledge of IPC and CIC stock that Starnes had promised to make to Mrs. Woodward. This claim was severed from the original action in the court's order of June 25, 1974, and the court retained jurisdiction over the amended complaint.

Although the order disposing of the claim based on the notes dismisses all three parties —Starnes, Metro, and Turnbull—for want of jurisdiction, on this appeal we are concerned only with Metro and Turnbull. The trial court entered an agreed judgment against Starnes on the amended complaint on September 13, 1974, for $247,396.24 plus interest, which represented the full amount due on the note. The agreement provided that Starnes would be en-

titled *to a credit if* Mrs. Woodward prevailed against the bank on appeal; it concluded all federal litigation between Mrs. Woodward and Starnes. We note that nothing would preclude Metro from suing Starnes in state court.

14. *See also Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2 Cir. 1974, 495 F.2d 228; *Walling v. Beverly Enterprises*, 9 Cir. 1973, 476 F.2d 393; *Travis v. Anthes Imperial Ltd.*, 8 Cir. 1973, 473 F.2d 515; *Kahan v. Rosenstiel*, 3 Cir. 1970, 424 F.2d 161, *cert. denied sub nom. Glen Alden Corp. v. Kahan*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290; *Carroll v. First National Bank*, 7 Cir. 1969, 413 F.2d 353, *cert. denied*, 1970, 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 494.

forbidden by the securities acts,[15] remembering that business transactions are not all reducible to a purchase or sale of a security. Many areas of business activity are governed by state laws, such as the Uniform Commercial Code, or other federal laws, such as the Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.* (1970) and the antitrust laws. Some transactions, it is only logical to assume, should be left to the operation of these other laws, for Rule 10b–5 was not designed to be the ethical Ten Commandments for all securities transactions. As this Court stated in *Herpich v. Wallace, supra,* 430 F.2d at 804–05:

> In the formulation of relief, however, concepts of fairness to those who are expected to govern their conduct under Rule 10b–5 should be considered. Protection for investors is of primary importance, but it must be kept in mind that the nation's welfare depends upon the maintenance of a viable, vigorous business community. Considered alone, the sweeping language of Rule 10b–5 creates an almost completely undefined liability. All that the rule requires for its violation is that someone "do something bad," Jennings & Marsh, Securities Regulation 961 (2d ed. 1968), in connection with a purchase or sale of securities. Without further delineation, civil liability is formless, and the area of proscribed activity could become so great that the beneficial aspects of the rule would not warrant the proscription. *See* Ruder, Pitfalls in the Development

of a Federal Law of Corporations by Implication Through Rule 10b–5, 59 Nw.U.L.Rev. 185, 207–208 (1964). In recognition of this problem, courts have sought to construct workable limits to liability under section 10(b) and Rule 10b–5 which will accommodate the interests of investors, the business community, and the public generally.

Thus, despite our firm support of Rule 10b–5's creative use in thwarting fraudulent schemes related to securities transactions, we recognize that we must also draw some limits on the scope of the Rule.

A preliminary task in every 10b–5 case is to find some "security" that was the object of the activities in question. *See Tcherepnin v. Knight,* 1967, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564; *SEC v. C. M. Joiner Leasing Corp.,* 1943, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88. The broad definition of a "security" in section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10) (1970), encompasses any "investment contract."[16] The classic definition of "investment contract," introduced in *SEC v. W. J. Howey Co.,* 1946, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244, provides that

> . . . an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ..

15. *See SEC v. National Securities, Inc.,* 1969, 393 U.S. 453, 466, 89 S.Ct. 564, 572, 21 L.Ed.2d 668, 680; *Herpich v. Wallace,* 5 Cir. 1970, 430 F.2d 792, 809; *City National Bank v. Vanderboom,* 8 Cir. 1970, 422 F.2d 221, 229, *cert. denied,* 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560.

16. Section 3(a)(10) provides as follows in its entirety:

> The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

328 U.S. at 298–99, 66 S.Ct. at 1103, 90 L.Ed. at 1249. This definition was extended to the Securities Exchange Act in *Tcherepnin v. Knight, supra,* 389 U.S. at 338, 88 S.Ct. at 554, 19 L.Ed.2d at 570.[17]

Plaintiff argues that the note Mrs. Woodward signed falls squarely within the parameters of the *Howey* test: (1) she "invested money" when she placed her stock at risk and assumed personal liability; (2) the "common enterprise" of CIC and Starnes received the loan proceeds, and (3) the $1250 per month she was to receive constituted profits "solely from the efforts of others." To buttress her claim, plaintiff asserts that her case is indistinguishable from *El Khadem v. Equity Securities Corp.,* 9 Cir. 1974, 494 F.2d 1224, in which the Ninth Circuit held a promissory note to be an investment contract.

 Certainly some promissory notes are "securities" within the meaning of the securities acts, notwithstanding the exclusion for notes with maturity not less than nine months. *SEC v. Continental Commodities Corp.,* 5 Cir. 1974, 497 F.2d 516, 524; *see* Securities Act. Rel. No. 4412, 26 Fed.Reg. 9158–59 (1961); *cf. Zeller v. Bogue Electric Mfg. Corp.,* 2 Cir. 1973, 476 F.2d 795, 799–800, *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146. In fact, this Court's earlier observations that "almost all notes" are securities reflected the well-known breadth of remedial coverage afforded by the Exchange Act. *Rekant v. Desser,* 5 Cir. 1970, 425 F.2d 872, 878; *Lehigh Valley Trust Co. v. Central Nat'l Bank,* 5 Cir. 1969, 409 F.2d 989, 992. On the other hand, when we are dealing with documents on the definitional fringes, we must tread carefully. The delicate distinction that determines each case is the commercial/investment dichotomy. In *Bellah v. First National Bank,* 5 Cir. 1974, 495 F.2d 1109, and *McClure v. First National Bank,* 5 Cir. 1974, 497 F.2d 490, *cert. denied,* 1975, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402, analysis under the commercial/investment rubric led to the conclusion that the notes were not securities, while in *SEC v. Continental Commodities Corp.,* 5 Cir. 1974, 497 F.2d 516, the same approach resulted in a holding that a note was a security.

The conclusions of law filed by the trial court in this case indicate that it relied on the erroneous legal standard of the section 3(a)(10) nine month maturity period in its decision to dismiss for want of jurisdiction. Although we find the debate on the question whether Mrs. Woodward's note was commercial or investment intriguing, we choose to postpone its resolution to another day. The question is close, given the history she recites, and it seems possible to us that her notes were for "investment." [18] If this case had not been fully tried, we would have been forced to remand to the district court for further consideration in light of the correct standard. Fortunately, however, a remand here is unnecessary, since the court wisely allowed the parties to present the entire case before finally deciding to dismiss. Even if we were to characterize the note as a security, we would have answered only the first question. Equally important is the issue whether the bank is a proper party in this case. This question turns on the standard governing liability for aiders

17. Although the *Howey* test has received some criticism, *see, e. g., Silver Hills Country Club v. Sobieski,* 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961); *Hawaii v. Hawaii Market Center, Inc.,* 52 Haw. 642, 485 P.2d 105 (1971), the Supreme Court reaffirmed its vitality in *United Housing Foundation, Inc. v. Forman,* 1975, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621.

18. The investment transaction, if there was one, would have been Mrs. Woodward's investment in CIC. The fact that the other individual had loaned the company money in December as a substitute for a purchase of securities, which Mrs. Woodward knew, shows that she was aware of this alternative form of investment. However, instead of loaning money directly to CIC, she loaned her credit and her stock for collateral. The money Metro loaned to Starnes, who passed it on to CIC, was thus made possible by Mrs. Woodward's willingness to serve as accommodation maker. In return for her credit and collateral, she was to receive the $1250 per month.

and abettors under 10b–5. Application of this legal standard to the trial court's findings of fact permits us to affirm the result below on different grounds. *See Helvering v. Gowran,* 1937, 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224, 230; *Associated Builders, Inc. v. Alabama Power Co.,* 5 Cir. 1974, 505 F.2d 97, 102; *cf. Hooper v. Mountain States Sec. Corp.,* 5 Cir. 1960, 282 F.2d 195.

### B. General 10b–5 Elements

■ Assuming, then, that Mrs. Woodward's note might be a security, we turn to the components of a claim based on Rule 10b–5.[19] By now, the existence of an implied private right of action can hardly be gainsaid. *E. g., Rekant v. Desser,* 5 Cir. 1970, 425 F.2d 872; *Reed v. Riddle Airlines,* 5 Cir. 1959, 266 F.2d 314. In *Sargent v. Genesco, Inc.,* 5 Cir. 1974, 492 F.2d 750, this Court stated that

> there are three basic elements to be pled and proved in 10b–5 actions: (1) conduct by the defendants proscribed by the rule; (2) a purchase or sale of securities by the plaintiffs "in connection with" such proscribed conduct; and (3) resultant damages to the plaintiffs.

492 F.2d at 759. Only the first two need command our attention, for under our resolution of the case we do not reach the damage issue.

■ 1. *Proscribed conduct.*—Subsumed within the first element are several factors of independent significance. First, some sort of fraud, in the special 10b–5 sense of the word, must have been committed. *See Herpich v. Wallace,* 5 Cir. 1970, 430 F.2d 792, 802;[20] *accord, Dupuy v. Dupuy,* 5 Cir. 1975, 511 F.2d 641, 643. Second, this Circuit recognizes some continuing vitality of the scienter requirement, at least to the extent that something more than ordinary negligence is required for 10b–5 liability. *Sargent v. Genesco, Inc.,* 5 Cir. 1974, 492 F.2d 750, 761; *Smallwood v. Pearl Brewing Co.,* 5 Cir. 1974, 489 F.2d 579, 606, *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113. The third component inherent in the first element of "proscribed conduct" is that of materiality. In *Affiliated Ute Citizens v. United States,* 1972, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741, the Supreme Court held that

> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.

406 U.S. at 153, 92 S.Ct. at 1472, 31 L.Ed.2d at 761.[21] This Court has con-

---

**19.** Federal jurisdiction depends on the "use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange." 15 U.S.C. § 78j (1970). However, this prerequisite generally poses no problem, since intrastate use of the telephone is sufficient to confer federal jurisdiction in a private 10b–5 action, and the evidence here shows several telephone calls. *Dupuy v. Dupuy,* 5 Cir. 1975, 511 F.2d 641, 643–44 & n. 3.

**20.** Specifically, the court in *Herpich* said that [t]ogether the section and the rule aim at reaching "misleading or deceptive activities, whether or not they are precisely and technically sufficient to sustain a common law action for fraud and deceit," Cady, Roberts & Co., 40 S.E.C. 907, (1961), carried on "in connection with" the purchase or sale of securities. They are not intended as a specification of particular acts or practices that constitute "manipulative or deceptive devices or contrivances," but are instead designed to encompass the infinite variety of devices that are alien to the "climate of fair dealing," *SEC v. Capital Gains Research Bur.,* 375 U.S. 180, 201, 84 S.Ct. 275, 288, 11 L.Ed.2d 237 (1963), that Congress sought to create and maintain. 430 F.2d at 802.

**21.** Even if reliance were important, *see* Note, 88 Harv.L.Rev. 584 (1975), in light of Mrs. Woodward's lack of experience it is probably satisfied here.

strued this passage to mean that "a reasonably prudent person *would* attach importance to the information." *Smallwood v. Pearl Brewing Co., supra,* 489 F.2d at 603–04. Cf. *Lehigh Valley Trust Co. v. Central Nat'l Bank,* 5 Cir. 1969, 409 F.2d 989, 993.

■ 2. *Purchase or Sale.*—The second basic element set out in *Sargent* rests on the "in connection with" language of the Rule. In *Birnbaum v. Newport Steel Corp.,* 2 Cir. 1952, 193 F.2d 461, cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356, the Second Circuit announced the rule that plaintiffs must be purchasers or sellers in order to invoke Rule 10b–5. The *Birnbaum* rule was construed liberally in *Superintendent of Ins. v. Bankers Life & Cas. Co.,* 1971, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128; nevertheless, as this Court has asserted, "[b]loody but unbowed, *Birnbaum* still stands." *Rekant v. Desser,* 5 Cir. 1970, 425 F.2d 872; *Lutgert v. Vanderbilt Bank,* 5 Cir. 1975, 508 F.2d 1035; see the extensive discussion of *Birnbaum* in *Smallwood v. Pearl Brewing Co., supra,* 489 F.2d at 589–95. Finally, the "in connection with" requirement encompasses the notion of privity, which seems to be to defendants what *Birnbaum* is to plaintiffs. Like most other legal concepts in the cocoon of Rule 10b–5, the common law variety of privity has undergone a metamorphosis, its definition assuming utterly new contours. See *Sargent v. Genesco, Inc.,* 5 Cir. 1974, 492 F.2d 750; *Rekant v. Desser,* 5 Cir. 1970, 425 F.2d 872; *Hooper v. Mountain States Securities Corp., supra,* 282 F.2d 195; cf. *Iroquois Indus., Inc. v. Syracuse China Corp.,* 2 Cir. 1969, 417 F.2d 963, cert. denied, 1970, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561. Groping for words to express the formula that justifies isolating the defendant and holding him responsible for a plaintiff's alleged injury,

courts have spoken of a nexus between the two parties, *Sargent v. Genesco, Inc., supra,* 492 F.2d at 761, and of some legally cognizable relationship between plaintiffs and defendants, *Lewis v. Marine Midland Grace Trust Co.,* S.D.N.Y. 1973, 63 F.R.D. 39. From the central point of privity, whirling outward with a strong centrifugal force, the Rule has brought within its galaxy more and more parties: from partners, tippees, and professional consultants, to conspirators and aiders and abettors. Our task, as we must accept it, is to ascertain in the case before us whether Metro Bank's acts and omissions possessed enough centripetal momentum to impel it into the sphere of 10b–5's reach.

C. Aiding and Abetting Liability

Although the complaint makes allegations of both primary and secondary liability against Metro and Turnbull, the alleged investment contract was clearly between Mrs. Woodward and CIC, through its agent Starnes. No one suggests either that she was investing in the bank, or that the bank was investing in CIC. The gist of her allegations is that the bank was aiding Starnes in the commission of a fraud; thus it is vulnerable if at all under the secondary liability theory of aiding and abetting.[22]

The elements of an aiding and abetting claim have not yet crystallized into a set pattern; however, we find the Sixth Circuit's analysis in *SEC v. Coffey,* 6 Cir. 1974, 493 F.2d 1304, cert. denied, 1975, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837, helpful:

Without meaning to set forth an inflexible definition of aiding and abetting, we find that a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused

---

22. Apparently, the Second Circuit takes the view that section 20(a) of the Act, 15 U.S.C. § 78t (1970), which deals with "controlling persons," is the exclusive way to hold someone secondarily liable. See *Gordon v. Burr,* S.D.N.Y.1973, 366 F.Supp. 156, aff'd, 2 Cir. 1974, 506 F.2d 1080. While this may be an unnecessarily restrictive approach to the securities acts, it is a question that we need not resolve here. Even under the arguably less stringent theory of aiding and abetting, we cannot condemn these defendants.

party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation.

493 F.2d at 1316. The elements adopted by the Third Circuit in *Landy v. Federal Deposit Ins. Corp.,* 3 Cir. 1973, 486 F.2d 139, *cert. denied,* 1974, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312, are similar to the *Coffey* test, but *Landy* refers to "an independent wrong" instead of a securities law violation, and knowledge of the wrong's existence instead of awareness of a role in improper activity. Finally, *Landy* omits the "knowing" requirement for the substantial assistance aspect. The first two *Landy* elements pose a danger of over-inclusiveness and seem to lose sight of the necessary connection to the securities laws. One could know of the existence of a "wrong" without being aware of his role in the scheme, and it is the participation that is at issue. The scienter requirement scales upward when activity is more remote;[23] therefore, the assistance rendered should be both substantial and knowing. A remote party must not only be aware of his role, but he should also know when and to what degree he is furthering the fraud.

For the purposes of Metro's appeal, both parties agree that fraud in the transaction between Mrs. Woodward and Starnes can be presumed. If Starnes' scheme amounted to an investment contract, and if Mrs. Woodward's cosigning the note and pledging the stock amounted to a purchase or sale, then the first branch of the *Coffey* test is probably satisfied. Although we do not purport to resolve this question, we will assume here the existence of a securities act violation committed by Starnes.

The second limb of the *Coffey* tree calls for general awareness that one's role was part of an overall activity that is improper. In this connection, the surrounding circumstances and expectations of the parties are critical. If the alleged aider and abettor conducts what appears to be a transaction in the ordinary course of his business, more evidence of his complicity is essential. The analysis of aiding-abetting liability at this point unavoidably harks back to the nature of the security that is the object of the transaction. Transactions occur as a whole and only later are they subjected to the scalpel of the legal dissector. If the securities involved are shares of common stock and someone aids and abets a fraud perpetrated in their sale, the culprit would be hard pressed to argue innocence once his awareness of the general sales activity was shown. On the other hand, if the document is barely a security at all, like a loan, then other independent commercial assumptions come into play, and the alleged aider-abettor may be unaware of any improper activity. Still, even for facially ordinary commercial transactions, a court may be influenced by a special duty imposed by the securities acts on the particular type

---

**23.** Compare the Supreme Court's definition of aiding and abetting in the criminal area enunciated in *Nye & Nissen v. United States,* 1949, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919:

In order to aid and abet another to commit a crime it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed."

336 U.S. at 619, 69 S.Ct. at 769, 93 L.Ed. at 925, *quoting United States v. Peoni,* 2 Cir. 1938, 100 F.2d 401, 402 (L. Hand, J.).

One commentator suggests that the secondary defendant must know of the illegal act and render positive assistance to the wrongdoers.

Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy,* In Pari Delicto, *Indemnification, and Contribution,* 120 U.Pa.L.Rev. 597, 600 (1972). Bromberg comments that the law still lacks a meaningful definition of aiding-abetting, but he also notes that "[o]ne fairly common and important thread in the judicial verbalizations, which is taken from the Restatement, is that the aider-abettor's conduct is or must be "substantial." A. Bromberg, Securities Law: Fraud § 8.5(530) (1974). The Restatement provision Bromberg refers to requires knowledge of another's breach of duty and substantial assistance or encouragement. Restatement, Torts § 876 (1939).

of party, such as an insider,[24] a controlling person,[25] an accountant,[26] or a broker.[27] Generally speaking, though, the securities acts do not impose strict liability upon all who come in contact with a security. The postman who mails a fraudulent letter is not covered by the Act, nor is the company that manufactured the paper on which the violating documents are printed. *See Hochfelder v. Midwest Stock Exchange,* 7 Cir. 1974, 503 F.2d 364, *cert. denied,* 419 U.S. 875, 95 S.Ct. 137, 42 L.Ed.2d 114; *SEC v. National Bankers Life Ins. Co.,* N.D.Tex. 1971, 324 F.Supp. 189, *aff'd,* 5 Cir. 1971, 448 F.2d 652; *Branham v. Material Sys. Corp.,* S.D.Fla.1973, 354 F.Supp. 1048. Rather, as Professor Bromberg points out, "the clue to liability is some sort of knowledge." A Bromberg, Securities Law: Fraud § 8.5(582) (1974). *See SEC v. National Bankers Life Ins. Co., supra,* 324 F.Supp. at 195; *Kerbs v. Fall River Indus., Inc.,* 10 Cir. 1974, 502 F.2d 731, 740; *Zabriskie v. Lewis,* 10 Cir. 1974, 507 F.2d 546, 554. Knowledge may be shown by circumstantial evidence, or by reckless conduct, but the proof must demonstrate actual awareness of the party's role in the fraudulent scheme. As Professor Ruder argued, using an example remarkably similar to the case at hand:

> If all that is required in order to impose liability for aiding and abetting is that illegal activity under the securities laws exists and that a secondary defendant, such as a bank, gave aid to that illegal activity, the act of loaning funds to the market manipulator would clearly fall within that category and would expose the bank to liability for aiding and abetting. Imposition of such liability upon banks would virtually make them insurers regarding the

conduct of insiders to whom they loan money. If it is assumed that an illegal scheme existed and that the bank's loan or other activity provided assistance to that scheme, some remaining distinguishing factor must be found in order to prevent such automatic liability. The bank's knowledge of the illegal scheme at the time it loaned the money or agreed to loan the money provides that additional factor. Knowledge of wrongful purpose thus becomes a crucial element in aiding and abetting or conspiracy cases.

Ruder, *supra* note 23, at 630–31.

The final requirement for aiding-abetting liability is that of knowing, substantial assistance of the violation. Most problematic in this area is the issue whether, or to what extent, silence and inaction can fulfill the requirement. This issue turns on the nature of the duty owed by the alleged aider and abettor to the other parties to the transaction. The standards courts have used for measuring culpability by silence have varied. Some declare without qualification that silence and inaction alone can create liability for aiding-abetting. *E. g., Kerbs v. Fall River Indus., Inc.,* 10 Cir. 1974, 502 F.2d 731, 740; *Brennan v. Midwestern United Life Ins. Co.,* 7 Cir. 1969, 417 F.2d 147, 154, *cert. denied,* 1970, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397; *Green v. Jonhop,* D.Ore. 1973, 358 F.Supp. 413, 419; *Anderson v. Francis I. du Pont & Co.,* D.Minn.1968, 291 F.Supp. 705, 709. Other courts squarely reject the notion that inaction alone is enough, distinguishing the contrary authority. *E. g., Landy v. Federal Deposit Ins. Corp., supra,* 486 F.2d at 161–62; *Wessel v. Buhler,* 9 Cir. 1971, 437 F.2d 279, 283. The Sixth Circuit in *SEC v. Coffey, supra,* 493 F.2d at 1317,

---

**24.** *E. g., SEC v. Texas Gulf Sulphur,* 2 Cir. 1968, 401 F.2d 833, *cert. denied sub nom. Coates v. SEC,* 1969, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756; *Rekant v. Desser,* 5 Cir. 1970, 425 F.2d 872.

**25.** *See* Securities Act of 1933 § 15, 15 U.S.C. § 77o (1970); Securities Exchange Act of 1934 § 20, 15 U.S.C. § 78t (1970).

**26.** *See* Securities Act of 1933 § 11, 15 U.S.C. § 77k (1970); Securities Exchange Act of 1934 § 18, 15 U.S.C. § 78r (1970).

**27.** *See, e. g.,* Securities Exchange Act §§ 11, 15, 15a, 15 U.S.C. §§ 78k, 78o, 78o–2, 78o–3 (1970); *Clement A. Evans & Co. v. McAlpine, supra,* 434 F.2d 100.

suggested a rule imposing liability "only where it is shown that the silence of the accused aider and abettor was consciously intended to aid the securities law violation." Taking a slightly different approach, the Ninth Circuit held that liability for silence or inaction arises "only when a duty to disclose has arisen." *Strong v. France,* 9 Cir. 1973, 474 F.2d 747, 752.

 We think that the best solution is a blend of the *Coffey* test and the *Strong* test. When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high "conscious intent" variety can be proved. Where some special duty of disclosure exists,[28] then liability should be possible with a lesser degree of scienter. *Cf. City National Bank v. Vanderboom,* 8 Cir. 1970, 422 F.2d 221, *cert. denied,* 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560; *accord, Vohs v. Dickson,* 5 Cir. 1974, 495 F.2d 607, 621–22; *Clement A. Evans & Co. v. McAlpine, supra,* 434 F.2d at 103. In a case combining silence/inaction with affirmative assistance, the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved.[29] If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b–5 liability without clear proof of intent to violate the securities laws. Conversely, if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability. In any case, the assistance must be substantial before liability can be imposed under 10b–5. *See Landy v. Federal Deposit Ins. Corp., supra,* 486 F.2d at 163; A. Bromberg,

**28.** A duty of disclosure may exist where any person possesses inside information, or where the law imposes special obligations, as for accountants, brokers, or other experts, depending on the circumstances of the case. This list, however, is not intended to be exhaustive.

**29.** *Cf. Affiliated Ute Citizens v. United States,* 1972, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (no special duty for ordinary function of transfer agent).

Securities Law: Fraud § 8.5(530) (1974). Substantiality is a function of all the circumstances.

 Thus, before someone can be caught within the net of aiding and abetting liability under Rule 10b–5, another party must have violated the securities laws, the alleged aider-abettor must be generally aware of his role in improper activity, and he must knowingly render substantial assistance. Without these limitations, the securities laws would become an amorphous snare for guilty and innocent alike. Given some restraints, we can judge whether Metro Bank and its officer Turnbull trespassed against the law, or if their acts were sufficiently free of sin to entitle them to the law's blessing.

### D. Metro and Turnbull

 Plaintiff relies on a number of factors to show Metro's and Turnbull's culpability. For convenience, we have summarized them in the following eight points:

(1) The proforma financial statement filed on CIC's behalf in November 1972 put the bank on notice of CIC's precarious financial condition.

(2) The frequent NSF occurrences in the CIC account during January and February revealed to the bank that CIC could not meet its debts as they became due, and therefore that it was insolvent.

(3) The bank asked Starnes to furnish an accommodation maker for the February note.

(4) Both CIC and Starnes had other loans outstanding at the bank.

Again, the knowledge requirement implicates the type of document labelled a security. Where, as in this case, the conclusion that a security even exists is highly questionable, the assistance must be clearly and intentionally directed toward aiding the fraud. Any other rule would wreak havoc with all commercial relationships, a result we do not desire.

(5) Turnbull represented to Mrs. Woodward that the $50,000 CD would be applied as collateral against the $200,000 note to Starnes that she co-signed.

(6) The Regulation U statement of purpose stated that the loan was to be used for working capital for CIC.

(7) The proceeds of the February note were used immediately to pay off CIC checks, thereby indicating some benefit to the bank from the transaction.

(8) At the time the note was renewed, Turnbull did not reveal CIC's worsened financial condition; he did not mention that the CIC account was no longer at Metro; and he did not tell Mrs. Woodward that the $1,000 interest checks would bounce.

Do these facts show that the bank had found a pigeon? Did the pigeon innocently nest in the bank's vault? Did the bank spread any bird seed to attract the pigeon to its note window? Did the bank even furnish any of the feed to Starnes in the feeding process? The record may justify an inference that the bank was pleased with the arrangement, but we cannot find any evidence of the bank's consciously helping to feed or to entice the pigeon into its precincts. Therefore, although we would not want to pass on the morality of the behavior to which plaintiff directs our attention, we have considered all of the evidence and have come to the conclusion that neither standing alone nor in the aggregate do the facts support an aiding and abetting claim under Rule 10b–5.

The fact that the pro forma financials showed a deficit retained earnings amount does not necessarily indicate recent economic reverses. The retained earnings or earned surplus figure represents the "balance of net profits, income, gains and losses of a corporation from

the date of incorporation;"[30] thus a deficit in this figure could represent losses from the distant past. The most that can be said about this factor is that the bank would have needed more information in order to make an informed decision on CIC's solidity. However, this bears only on the bank's willingness to assume risks; it does not tend to show conscious intent to violate Rule 10b–5.[31]

Although CIC's account at Metro was admittedly unprofitable to the bank, and was plagued by NSF occurrences, this fact also fails to convince us of any dereliction on Metro's part. Even if these difficulties put Metro on notice that CIC was in trouble, Metro's awareness of its customer's problems was not the equivalent of a duty to disclose those difficulties to a proffered accommodation maker. Critical to our sanction of Metro's behavior here is the trial court's second "conclusion of law":

> The evidence showing merely a loan made by Bank to Starnes and cosigned by Mrs. Woodward payable in 90 days and secured by pledges of a $50,000 certificate of deposit issued by Bank of [sic] Starnes and by Mrs. Woodward's pledge of two duly registered stocks of corporations listed on the New York Stock Exchange, the transaction is an ordinary commercial loan and not a "sale" of a security under the Act.[32]

Implicit in this "conclusion of law" is the credibility judgment of the trial court to believe the evidence supporting the ordinary commercial nature of the transaction. The evidence that the NSF checks were always covered by transfers from other banks tends to negate the possibility that Metro was aware of its role in improper activity and was knowingly rendering substantial assistance. Although we are not bound by the rela-

---

**30.** Accounting Terminology Bulletin No. 1 ¶ 34, APB Accounting Principles: Original Pronouncements (CCH 1973).

**31.** Starnes' personal financial holdings consisted primarily of CIC and IPC stock; therefore the bank's evaluation of his solvency would

have rested largely on its estimation of CIC and IPC.

**32.** The court's conclusion of no sale was based on the wrong legal standard, since at times a loan may constitute a "sale" for purposes of 10b–5, as discussed *supra.*

tionships structured by Texas law, the consistency of the bank's behavior with its state law duties also undercuts the likelihood that it knew it was aiding and abetting illegal conduct.

No significance can be attached to Metro's mere request for an accommodation party unless we were to hold that accommodation arrangements automatically impose on banks a duty of disclosure on pain of 10b–5 liability. The *raison d'etre* of accommodation is to find stronger financial support for a proposed bill or note. We are not prepared effectively to abolish this commercial practice of Rule 10b–5 without some indication that Congress intended this result.[33] Texas law suggests that banks may not be required to disclose information about accounts to third parties. *See* Tex.Rev. Civ.Stat.Ann. art. 342–705 (1973); *Wilson v. City of Port Lavaca*, 407 S.W.2d 325 (Tex.Civ.App.-Corpus Christi 1966, writ ref'd n.r.e.). The Texas Uniform Commercial Code provision governing accommodation parties imposes no duty of disclosure on banks. Tex.Bus. & Comm. Code Ann. § 3.415 (1968). Indeed, in another context the Code provides that knowledge of the accommodation character of a contract does not defeat a purchaser's status as a holder in due course. Tex.Bus. & Comm.Code Ann. § 3.304(d) (3) (1968).

The other loans CIC and Starnes had outstanding at the bank were also confidential information that Metro had no duty to disclose to Mrs. Woodward, absent some new expansion of 10b–5. Under the circumstances, the logical leap from the fact of the existence of other loans to the inference of evil intent is too lengthy for us to complete.

When Turnbull represented that the CD would be collateral for the $200,000

note, he was telling the truth. For the purposes of this discussion, we will assume that he did not orally disclose that the security agreements Mrs. Woodward signed covering the stock and the CD contained so-called cross-collateral clauses.[34] In the absence of any duty to read and explain the document to the signers, we cannot hold that Turnbull's silence on this point was the sort of knowing and substantial assistance required for aiding and abetting liability. What is far more likely is that as a matter of normal business practice he never explained these documents to signers—sharp dealing, perhaps, but not a 10b–5 violation.

We find it impossible to attach some nefarious significance to the statement on the Regulation U form that the loan was to provide working capital. Regulation U was promulgated under the authority of the Securities Exchange Act § 7, 15 U.S.C. § 78g (1970). That section was enacted "[f]or the purpose of preventing the excessive use of credit for the purchase or carrying of securities." The bank's concern with the Regulation U statement is whether the loan is "purpose" or "nonpurpose"—*i. e.* whether or not it will be used for the purpose of purchasing or carrying any margin stock. *See* 12 C.F.R. § 221.1 (1975); *E. F. Hutton & Co. v. Brown*, S.D.Tex.1969, 305 F.Supp. 371, 384; *cf.* 12 C.F.R. § 221.-120(a) (1975). Once the bank has determined that the loan is nonpurpose, as the Metro—Starnes loan clearly was, its responsibility ends. The fact that Mrs. Woodward may have relied on the statement does not suffice to connect Metro to any fraud.

The proceeds of the February note were turned over immediately by Starnes to CIC's account and used to pay a substantial number of CIC checks.

---

**33.** Actually, Congress and the Commission probably never intended that the Rule be extended as far as it has been. *See* Ruder, *Civil Liability Under Rule 10b–5: Judicial Revision of Legislative Intent?*, 57 Nw.U.L.Rev. 627 (1963). We neither desire nor would we be able to cut back on the established scope of 10b–5. However, we can refuse to create a new, sweeping expansion of the Rule which would pre-empt significant areas of commercial law.

**34.** The cross-collateral clause had the effect of extending Mrs. Woodward's liability to Starnes' other two outstanding personal loans. Neither of these loans became delinquent until after the May 29 renewal of the loan at issue.

Metro's role in this was simply to pay the checks drawn on the account. In sharp contrast is the bank's behavior in *Carroll v. First National Bank,* 7 Cir. 1969, 413 F.2d 353, *cert. denied,* 1970, 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 494, where the bank facilitated a credit bubble fraud by arranging for persons other than the designated customers to pay drafts and purchase securities in order to conceal the precarious nature of the purchases, and by holding a large number of uncollectible drafts in the hopes that the value of the purchased securities would rise. Simply paying checks in accordance with its customer's order raises no inference of fraud or substantial assistance to a fraud.

Finally, Turnbull's silence at the time the February note was renewed in May does not meet the requirements for aiding and abetting by silence set out above. He owed no special duty of disclosure to Mrs. Woodward, and as a matter of fact Starnes' interest checks were drawn on another Dallas bank and were not submitted to Metro until several days after the renewal transaction.

Without a doubt, Mrs. Woodward's association with Starnes and with Metro Bank led to unfortunate results for her. She may have had a viable 10b–5 claim against Starnes; she may yet prevail in the state courts against both Starnes and Metro—we express no opinion on these issues. What we are compelled to hold is that under these facts she cannot prevail against Metro Bank and Ron Turnbull. Though our sympathies are with her, the general principles for a 10b–5 action and the specific policies circumscribing a secondary liability claim do not permit us to find for her. We are simply not willing to create a new expansion of Rule 10b–5 covering all accommodation arrangements. While we are confident that our solution here is correct, we have written at length to insure that our opinion will not be used to cordon off all bank-associated notes from the coverage of 10b–5. Under different facts, demonstrating awareness of complicity and substantial assistance, we would not hesitate to hold a bank to account. Here we have searched from the north pole to the south pole of 10b–5, and Mrs. Woodward is still frozen out. We therefore affirm the trial court's order dismissing Metro Bank and Ron Turnbull without prejudice to possible state court claims, on grounds of failure to state a claim under the federal securities acts. The triangulation forms no geometric design of 10b–5 or any other federal cognate liability.

Affirmed.