Thomas JUNGCK and Richard Jungck, Plaintiffs,

v.

Robert NANZ, Donald Taylor and Waukesha State Bank, Defendants.

Civ. A. No. 86–C–606.

United States District Court, E.D. Wisconsin.

Nov. 6, 1989.

Charles H. Barr, Barr & Shapiro, Menomonee Falls, Wis., for plaintiffs.

John C. Curran and Richard R. Kobriger, Jr., Cramer, Munthauf & Curran, Waukesha, Wis., for Taylor and Waukesha State Bank.

Robert Nanz, pro se.

ORDER

REYNOLDS, Senior District Judge.

The plaintiffs in the above-captioned action allege that they were fraudulently induced by the defendants to invest the sum of $60,000.00 with the defendant Robert Nanz in a real estate rehabilitation project. The plaintiffs allege the following four causes of action against defendants Donald

L. Taylor ("Taylor") and Waukesha State Bank ("the Bank"): (1) violation of the Securities Exchange Act of 1934 and its implementing rule 10b–5; (2) common law fraud and deceit; (3) common law strict responsibility for misrepresentation; and (4) common law negligent misrepresentation.

Presently before the court is a motion for summary judgment of defendants Taylor and the Bank, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the grounds that the plaintiffs' federal securities law claim against Mr. Taylor and the Bank is barred by the statute of limitations and Mr. Taylor and the Bank are not liable under the securities law theories pled in the plaintiff's amended complaint. The plaintiffs have opposed this motion. The court has considered the parties' positions and will deny the defendants' motion for summary judgment.

## FACTS

The plaintiffs, Richard and Thomas Jungck, are brothers. Prior to October of 1983, plaintiffs had owned and operated mobile home parks. They originally purchased a mobile home park in Green Bay in 1966 for $75,000.00. Over the years they bought and sold four mobile home parks, the last one being purchased in Columbia, South Carolina for $500,000.00. (T. Jungck Dep. pp. 4–7.)

In September of 1983, Thomas Jungck mentioned to a friend of his, William LeBeau, that he, Thomas Jungck, had sold the mobile home park in South Carolina and that he had a large gain on the sale and was looking for a tax shelter. (T. Jungck Dep. p. 19; LeBeau Dep. p. 20.) Mr. LeBeau then brought defendant Robert Nanz ("Nanz") over to Thomas Jungck's house and introduced them. Thomas Jungck told Mr. Nanz that he and his brother would be interested in any deal to reduce the income taxes that they were going to be paying. Mr. Nanz said that he was working on various apartment projects in the Chicago area which were eligible for the investment tax credit. (T. Jungck Dep. pp. 21, 22.)

Subsequent to that meeting, Mr. LeBeau telephoned Thomas Jungck and told him that the investment tax credit is a legal tax deferment plan. Mr. Nanz also telephoned Thomas Jungck and told him that he would come over to Thomas Jungck's house again and show Mr. Jungck some proposals that he had written up. Mr. Nanz visited Thomas Jungck again sometime during the last week of September or the first week in October, 1983. Richard Jungck was present at that second meeting with Thomas Jungck. Mr. Nanz told them that he needed some "seed money" to acquire an apartment on Winthrop Drive in Chicago and explained to them how the investment tax credit would work and how much of an investment would be required. (T. Jungck pp. 24–26; R. Jungck pp. 7, 8.)

A third meeting was held between Mr. Nanz and the plaintiffs in October of 1983. During either the second or third meeting, Mr. Nanz gave the plaintiffs two written proposals. One involved a tax sheltered investment at 4718 North Winthrop. (T. Jungck Dep. p. 32, Ex. 11.) The other involved a tax sheltered investment at 4736 North Winthrop. (T. Jungck Dep. p. 32, Ex. 5.) The investment for 4718 North Winthrop would require a cash investment of $60,000.00. The investment at 4736 North Winthrop would have required a cash investment of $150,000.00. The plaintiffs did not invest in 4736 North Winthrop, but they did invest in 4718 North Winthrop ("the Winthrop Project").

The proposal for the Winthrop Project stated that in return for a cash investment of $60,000.00, the investor would receive an unrecorded exculpatory land contract, a lease-back arrangement with Progress Realty with payments equal to the land contract payments, a recorded option on the property, and 100% of all tax benefits from the building, and no liability. (T. Jungck Dep. Ex. 5.) The proposal indicated that the investor would receive an investment tax credit on the rehabilitation of $70,-000.00, first year straight line depreciation of $20,300.00, and a 100% return of his investment, plus $20,000.00 on July 1, 1985.

Mr. Nanz explained to the Jungcks that title to the real estate would be put into trust. Mr. Nanz would convey the property to them on an unrecorded land contract so that they would be eligible for the investment tax credit. After a year or two, the Jungcks could then sell the property back to Nanz. Additional financing for the project of approximately $350,000.00 would be acquired from a loan from Community Investment Corporation ("CIC") in Chicago. (T. Jungck Dep. p. 36; R. Jungck Dep. p. 31).

At the third meeting between the plaintiffs and Mr. Nanz, Mr. Nanz told the plaintiffs that they would have to invest $60,000.00. The plaintiffs told Mr. Nanz that they did not have that much cash on hand. Mr. Nanz then told them that he knew a banker in Waukesha by the name of Don Taylor with whom Mr. Nanz had had past financial dealings which had always worked out satisfactorily. (T. Jungck Dep. pp. 33–34, 57.)

After the plaintiffs' third meeting with Mr. Nanz, Mr. Taylor telephoned Thomas Jungck at home stating that he had talked to Mr. Nanz regarding the Winthrop Project in which the Jungcks were interested, and that he would like to put together a loan package for the Jungcks. (T. Jungck Aff. p. 47.) Thomas Jungck informed Mr. Taylor that the loan proceeds would be invested with Mr. Nanz in the Winthrop Project, for the main purpose of procuring the investment tax credit. (T. Jungck Dep. pp. 58–59.) Mr. Taylor said that it sounded like a good deal to him. (T. Jungck Dep. pp. 47, 59.) Thomas Jungck asked Mr. Taylor if he had anything bad or derogatory to say about Mr. Nanz, and Mr. Taylor said, "No, quite the opposite. Nanz has got a proven track record.... [h]e's a real success." (T. Jungck Dep. pp. 59–60.)

Richard Jungck separately informed Mr. Taylor how the loan proceeds would be used, and discussed the investment tax credit with him. (R. Jungck Dep. pp. 32–33.) In a personal meeting with Richard Jungck, Mr. Taylor said that Mr. Nanz had been a long-time friend of his, and was known and respected in Waukesha County and was a successful businessman. (R. Jungck Dep. p. 9.) At the loan closing on December 6, 1983, when Richard Jungck commented to Mr. Taylor about the high rate of interest on the loan, Mr. Taylor replied that the Jungcks would make money on the deal, so that Richard should not worry about the rate of interest. (R. Jungck Dep. pp. 26–27). When Richard Jungck expressed concern that he would be unable to repay the bank loan within its two-year term, Mr. Taylor replied that the building would be sold by that time. (R. Jungck p. 27.)

Don Taylor asserts that, although he knew that the plaintiffs wished to obtain a loan from Waukesha State Bank for the purposes of making an investment with Mr. Nanz, Mr. Taylor was not at all familiar with the Winthrop Project and had not received any specific information about it. Neither Mr. Taylor nor Waukesha State Bank were involved in the investment or any other investments with Mr. Nanz. (Taylor Aff. ¶¶ 4–5; Taylor Dep. pp. 5–6, 12.) Other than the usual loan charges, neither Taylor nor Waukesha State Bank received any compensation from the Jungcks as a result of the transaction between the plaintiffs and Mr. Nanz. (R. Jungck Dep. p. 28; T. Jungck Dep. p. 74.)

The plaintiffs did not seek any legal advice regarding the investment, nor did they inspect the apartment building prior to their investment. (T. Jungck Dep. p. 70; R. Jungck Dep. p. 19.) Rather, Mr. Nanz took Thomas Jungck to see an accountant by the name of Michael Chapman who explained to Mr. Jungck how the investment tax credit worked. Mr. Jungck inquired of Chapman whether what Nanz was presenting to him was true. Chapman told Mr. Jungck that it was perfectly legal. (T. Jungck Dep. p. 50.)

On October 27, 1983, the Jungcks gave Mr. Nanz $10,000.00. On November 9, 1983, they gave Mr. Nanz another $5,000.00. In return, Mr. Nanz gave the Jungcks a promissory note for $20,000.00, due on or before January 14, 1984. (T. Jungck Dep. pp. 44–46, Ex. 12.)

The parties agree that the loan was closed at Waukesha State Bank on December 6, 1983. Waukesha State Bank loaned the Jungcks $80,000.00. As collateral for the loan, Waukesha State Bank took an assignment of a land contract owing to Richard Jungck and mortgages on two parcels of real estate owned by Richard Jungck. The Jungcks deposited the loan proceeds into a joint checking account which they established at Waukesha State Bank on the day of closing. From the loan proceeds, the Jungcks issued a check to Mr. Nanz for $60,000.00. (Defs. Taylor and Bank's Br. in Supp. of S.J. p. 6.)

Subsequent to the closing, Mr. Nanz, doing business as Progress Realty, and the Jungcks entered into a land contract whereby Mr. Nanz agreed to sell to the Jungcks the Winthrop Project for $400,000.00, $60,000.00 at the execution of the contract and the balance of $340,000.00 to be paid by the lease payments in accordance with a lease which the Jungcks then executed to Mr. Nanz. The parties also executed a construction contract whereby Mr. Nanz agreed to completely rehabilitate the property. (T. Jungck Dep. Exs. 17–20.)

The Winthrop Project was never completed. Mr. Nanz had hired Henry Cooper as a construction supervisor. After the project was underway, however, Mr. Cooper suffered a heart attack. Mr. Nanz was unable to secure the loan from Community Investment Corporation and could not personally stay involved in the project because he was subjected to a probation revocation hearing. (Statement of Nanz at pp. 21–22.)

Robert Nanz at one time had the reputation as one of the largest and more successful apartment developers in the State of Wisconsin. (LeBeau Dep. p. 4; Taylor Dep. p. 12.) Don Taylor testified that his understanding was that in the mid–1970's Mr. Nanz fell on hard times. One of his banks withdrew its support and he did not have enough cash on hand to meet his obligations. Criminal charges were brought against him in 1975 or 1976 relating to a "check kiting" practice Mr. Nanz had among various banks in order to try and stay in business. Mr. Nanz was sent to prison in 1977 or 1978 for a year or two. Upon his release he was placed on probation. (Taylor Dep. pp. 12–16.) Although Mr. Taylor was aware of this background, the Jungcks claim that they were not.

The Jungcks retained accountant Michael Chapman to prepare their 1983 income tax returns. Richard and Thomas Jungck timely filed an application for an automatic extension for filing those returns. They received their completed 1983 returns from Mr. Chapman in early August 1984, and filed the returns then. (T. Jungck Aff. ¶ 2; R. Jungck Aff. ¶ 2; Michael Chapman Aff. ¶¶ 3–4.) In September and October of 1984, Richard Jungck received tax refunds as a result of his claim of the investment tax credit on his 1983 return. (R. Jungck Aff. ¶ 2.)

In late February 1985, Richard Jungck received a letter from the Internal Revenue Service. That letter, dated February 26, 1985, was his first indication that his 1983 federal tax return would be audited. (R. Jungck Aff. ¶ 3; Chapman Aff. ¶ 5.) The first indication he had that the Winthrop Project was in jeopardy or was not bona fide was his third meeting with the IRS auditor in the spring of 1985, at which the auditor expressed doubt that the investment tax credit would be allowed. (R. Jungck Aff. ¶ 10.)[1] Thomas Jungck was also present at this meeting, which similarly furnished his first indication that the Winthrop Project was not legitimate. (T. Jungck Aff. ¶ 11.)

In early 1984, Mr. Nanz repaid $5,000.00 of the "seed money" which he had borrowed from the Jungcks in October and November of 1983. (T. Jungck Aff. ¶ 4; R. Jungck Aff. ¶ 5.) When Thomas Jungck

---

1. Richard Jungck's affidavit states that the testimony in his deposition that he was initially visited by an IRS agent in the summer of 1984 is in error; he was thinking of the summer of 1985, by which time he had met several times with the IRS auditor, and at which time it was apparent to him that the investment tax credit would be disallowed. (R. Jungck Aff. p. 8.) The defendant has not disputed the plaintiffs' allegation that the plaintiffs first became aware of the alleged fraud in the spring of 1985.

inquired of Mr. Nanz regarding the balance of the "seed money", Mr. Nanz explained that there would be a delay in closing the loan from Community Investment Corporation ("CIC") but that he expected to receive the loan once the paperwork was completed. He also advised Thomas Jungck that the rehabilitation work on the apartment building was progressing well. (T. Jungck Aff. ¶ 4.) The Jungcks knew that Mr. Nanz planned to repay this initial "seed money" from the proceeds of the CIC loan. (T. Jungck Aff. ¶ 4; R. Jungck Aff. ¶ 5.)

Thomas Jungck made several additional inquiries of Mr. Nanz during 1984, and on each occasion Mr. Nanz assured him that the loan from CIC was still pending, and that the rehabilitation of the apartment building was progressing well. (T. Jungck Aff. ¶ 5.) On several occasions during 1984, Thomas Jungck received a report from William Le Beau, who represented on each such occasion that he had been at the apartment building and had observed the rehabilitation in progress, and that the work was proceeding as expected. (T. Jungck Aff. ¶ 6; LeBeau Aff. ¶¶ 2–4.)

The major purposes of the Jungcks' investment with Mr. Nanz were to receive a substantial and immediate tax credit, and to receive a profitable return on their total investment within a year or two. They were not primarily concerned with early repayment of the "seed money" loan, and they considered it a minor part of their total investment of $75,000.00. The progress of the rehabilitation of the apartment building was much more important to them than early repayment of the "seed money" loan, because the rehabilitation would enable them to realize the promised tax credits and return on their investment. (T. Jungck Aff. ¶ 7; R. Jungck Aff. ¶ 6.)

The Jungcks' concern about the "seed money" was allayed, and did not indicate to them that the rehabilitation project itself was fraudulent because of the foregoing reasons; namely, the Jungcks were not primarily concerned with early repayment of the "seed money" loan, both Mr. Nanz and Mr. LeBeau reported that the rehabilitation (their primary interest) was proceed-

ing as expected, Mr. Nanz had repaid $5,000.00 of the "seed money" and in addition had previously paid all the closing costs for which the Jungcks were charged by Waukesha State Bank, and because of the previous representations of both Mr. LeBeau and Mr. Taylor that Mr. Nanz had an excellent track record and recognized expertise in real estate projects of this type. (T. Jungck Aff. ¶ 8; R. Jungck Aff. ¶ 7.)

Prior to 1985, the Jungcks had no information whatsoever which indicted that Mr. Nanz had a criminal record, was a probationer or was an alcoholic. (T. Jungck Aff. ¶ 10; R. Jungck Aff. ¶ 9; LeBeau Aff. ¶ 6.) By June of 1985, however, it had become apparent to the Jungcks that the IRS would disallow the investment tax credit, and at that point Thomas Jungck began to make inquiries regarding the bona fides of the Winthrop Project. It was then that he learned of Mr. Nanz's criminal, business, and personal problems. Mr. LeBeau knew about these problems previously, but had not discussed them or anything else derogatory about Mr. Nanz, with the Jungcks. (LeBeau Aff. ¶¶ 5–7.) On June 7, 1985, Mr. Jungck consulted Assistant United States Attorney Mel Johnson, who was prosecuting Mr. Nanz's revocation proceeding. On June 20, he retained Attorney John J. Turner of Chicago to investigate the status of the Winthrop Project. (T. Jungck Aff. ¶ 11.)

Some work was actually performed to rehabilitate the apartment building. It was never completed, however, and it was torn down. (T. Jungck Dep. pp. 71–72; R. Jungck Dep. p. 23.)

On June 10, 1986, the plaintiffs commenced this action against Robert Nanz. On September 4, 1987, the plaintiffs filed a motion seeking leave to file an amended complaint to add Donald Taylor and Waukesha State Bank as defendants. On November 12, 1987, the court granted plaintiffs' motion to file an amended complaint, and on December 7, 1987, the plaintiffs filed their amended complaint adding Donald Taylor and Waukesha State Bank as defendants.

## LEGAL ANALYSIS

The plaintiffs' amended complaint alleges that Don Taylor and the Bank violated 15 U.S.C. § 78j (Securities Exchange Act of 1934 § 10b) and SEC Rule 10b–5, 17 CFR § 240.106–5,[2] (hereinafter "Rule 10b–5") promulgated thereunder. (Amended Compl. ¶¶ 75–78.) A preliminary task in every Rule 10b–5 case is to find some "security" which was the object of the activities in question. *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94 (5th Cir. 1975). The broad definition of a "security" in § 3(a)(10) of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10) (1970), encompasses any "investment contract." *Woodward*, 522 F.2d at 91. For the purpose of this motion, the defendants agree and the court assumes that the transaction between the Jungcks and Mr. Nanz is an investment contract for purposes of the Securities Exchange Act.

Assuming, then, that defendant Robert Nanz offered to sell and sold securities to the plaintiffs and plaintiffs purchased such securities, the court turns to the components of a claim based on Rule 10b–5. There are three basic elements to be pled and proved in Rule 10b–5 actions: (1) conduct by the defendants proscribed by the rule; (2) a purchase or sale of securities by the plaintiffs "in connection with" such proscribed conduct; and (3) resultant damages to the plaintiffs. *Woodward*, 522 F.2d at 93.

Although the plaintiffs' amended complaint makes allegations of primary liability against Don Taylor and the Bank, the alleged investment contract was clearly between the Jungcks and Robert Nanz. As in the *Woodward* case, no one in this action is suggesting that the plaintiffs were investing in the bank, or that the bank was investing in the project. The gist of the Jungcks' allegations in this case is that the Bank and Don Taylor were aiding Nanz in the commission of a fraud; thus the Bank, and Don Taylor are only liable, if at all, under the secondary liability theory of aiding and abetting.

The Seventh Circuit has held that under certain circumstances a civil cause of action for aiding and abetting a § 10(b) and Rule 10b–5 violation may be maintained. *Cong. of Passion, Holy Cross v. Kidder Peabody*, 800 F.2d 177, 183 (7th Cir.1986). The Seventh Circuit has not, however, delineated, in any comprehensive way, the elements of such a cause of action. *Id.* at 183. The concept of aider and abettor liability has not been fully developed, and there remains among the courts variations among the precise formulation of the doctrine. *See Comment: Lender's Liability for Aiding and Abetting Rule 10b–5 Violations; The Knowledge Standard*, 41 Sw.L.J. 925 (1988), at 928.

Both plaintiffs and defendants in the instant case point to the standard in *Woodward*, a fifth circuit case, in analyzing the Bank's and Don Taylor's liability as an aider and abetter. *Woodward* set forth the following test to determine who is subject to section 10b–5 aiding-and-abetting liability: "[B]efore someone can be caught within the net of aiding and abetting liability under Rule 10b–5, another party must have violated the securities laws, the alleged aider-abettor must be generally aware of his role in improper activity, and he must knowingly render substantial assistance." *Woodward*, 522 F.2d at 97. The fifth circuit has recently restated the *Woodward* test to determine who is subject to Rule 10b–5 aiding-and-abetting liability:

(1) There must have been a securities violation by the primary party; (2) the

---

**2.** 17 CFR § 240.10b–5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

aider and abettor must have had a "general awareness" of its role in a Rule 10b–5 violation; and (3) the aider and abettor must have "knowingly and substantially assisted" in the Rule 10b–5 violation.

*Bane v. Sigmundr Exploration Corp.*, 848 F.2d 579, 581 (5th Cir.1988).

■ Although we do not purport to resolve this question, for the purpose of the Bank's and Don Taylor's motion for summary judgment the court will assume here the existence of a securities act violation committed by Nanz. The second branch of the *Woodward* test calls for general awareness of the Bank and Mr. Taylor in a Rule 10b–5 violation. Knowledge may be shown by circumstantial evidence, or by reckless conduct, but the proof must demonstrate actual awareness of the party's role in the fraudulent scheme. *Woodward*, 522 F.2d at 96.

Plaintiffs rely on a number of factors to show Don Taylor's and the Bank's culpability. Those factors are as follows:

(1) After speaking with Mr. Nanz about the Winthrop Project, Mr. Taylor telephoned Thomas Jungck at Mr. Jungck's home. Mr. Taylor told Thomas that he had talked to Nanz regarding the construction project in Chicago and told Thomas that he would like to put together a loan package for Thomas and his brother Richard Jungck. (T. Jungck Dep. p. 47.)

(2) When Thomas Jungck confirmed to Mr. Taylor that the loan proceeds would be invested with Mr. Nanz in a Chicago apartment project for the main purpose of procuring the investment tax credit, Mr. Taylor said that it sounded like a good deal to him (T. Jungck Dep. pp. 47, 57–59.)

(3) When Thomas Jungck asked Mr. Taylor if he had anything bad or derogatory to say about Mr. Nanz, Mr. Taylor said, "No, quite the opposite, Nanz has got a proven track record; he's a real success." (T. Jungck Dep. pp. 59–60.)

(4) Richard Jungck separately informed Mr. Taylor how the loan proceeds would be used, and discussed the investment tax credit with him. In a personal meeting with Richard Jungck, Mr. Taylor said that

Mr. Nanz had been a long-time friend of his, and was known and respected in Waukesha County as a successful businessman. (R. Jungck Dep. pp. 9, 32–33.)

(5) At the loan closing on December 6, 1983, when Richard Jungck commented to Mr. Taylor about the high rate of interest on the loan, Mr. Taylor replied that the Jungcks would make money on the deal, so that Richard Jungck should not worry about the rate of interest. (R. Jungck Dep. pp. 26–27.)

(6) When Richard Jungck expressed concern that he would be unable to repay the bank loan within its two-year term, Mr. Taylor replied that the building would be sold by that time. (R. Jungck Dep. p. 27.)

The plaintiffs emphasize that for the purposes of the summary judgment motion, these facts must not only be taken as true but viewed in the light most favorable to the plaintiffs. The parties dispute whether Mr. Taylor or the Bank had a "general awareness" of securities law violations by Nanz in connection with the Winthrop Project. Based upon the facts presented to the court, the court finds that this is a dispute of material fact which cannot be resolved by summary judgment. The court finds that the issue of whether the Bank or Mr. Taylor knowingly and substantially assisted in a securities law violation is also a disputed question of a material fact which cannot be resolved by summary judgment.

■ The defendants also argue that the plaintiffs' federal securities law claim is barred by the statute of limitations. Section 10((b) of the Securities Exchange Act of 1934 has no statutorily prescribed limitations period. Federal courts must therefore look to the limitations period applicable to the analogous cause of action under state law to determine the period limiting actions brought under the section and its correlative rule. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 210 n. 29, 96 S.Ct. 1375, 1389 n. 29, 47 L.Ed.2d 668 (1976). The limitations period embodied in Wis. Stat. § 551.59(5) applies to actions commenced in United States district courts in Wisconsin asserting claims under Rule

10b–5. *Cahill v. Ernst & Ernst*, 625 F.2d 151, 153 (7th Cir.1980).

Prior to and at the time of the date of the loan, December 6, 1983, Wis.Stat. § 551.59(5) (1981–82), provided:

No action shall be maintained under this section unless commenced before the expiration of 3 years after the act or transaction constituting the violation or the expiration of one year after the discovery of the facts constituting the violation, whichever first expires....

On April 27, 1984, this statute was amended by deletion to read:

No action shall be maintained under this section unless commenced before the expiration of 3 years after the act or transaction constituting the violation....

Mr. Taylor and the Bank assert that the earlier ("1983") version of § 551.59(5) applies to this case. Plaintiffs assert that the current version of § 551.59(5) applies to this case.

In their motion for summary judgment defendants argue that the 1983 version of Wis.Stat. § 551.59(5) was in effect at the time the plaintiffs' cause of action accrued, and that it is therefore applicable in this case. In response, plaintiffs argue that although the federal courts are to adopt from the forum state the limitations period of the state law most closely resembling Rule 10b–5, that is the full extent of state law influence. Plaintiffs argue that the point at which the statutory period commences is a matter governed by federal common law.

In reply, the defendants argue that the plaintiffs' position that the applicable statute of limitations is the current version of Wis.Stat. § 551.59(5), was expressly rejected by the court in *Poquette v. Community State Bank*, 631 F.Supp. 1480 (W.D.Wis. 1986). The defendants further argue that the plaintiffs confuse "accrual" of a cause of action with the doctrine of "equitable tolling" which, defendant argues, may delay the beginning of the running of a statute of limitations, but has no effect on when the cause of action accrues. The defendants then cite a Delaware district court opinion for the proposition that a

Rule 10b–5 cause of action "accrues" on the date that a party enters into a binding agreement to buy or sell securities. *Hill v. Equitable Bank*, 655 F.Supp. 631, 638 (D.Del.1987).

The facts relevant to this issue are as follows: The parties agree that the date of the loan was December 6, 1983. The plaintiffs allege that the first indication that they had that the Winthrop Project was in jeopardy or was not bona fide was their third meeting with the IRS auditor in the spring of 1985, at which the auditor expressed doubt that the investment tax credit would be allowed. (R. Jungck Aff. ¶ 10.) The defendants do not dispute that the first indication that plaintiffs had that the rehabilitation project was in jeopardy or was not bona fide was in the spring of 1985. Nor do the defendants allege that the plaintiffs in the exercise of reasonable diligence discovered or should have discovered the fraud earlier than the spring of 1985. Therefore, the court will assume for the purpose of this motion that the first indication plaintiffs had that the Winthrop Project was in jeopardy or was not bona fide was the spring of 1985. The plaintiffs filed a motion to amend their complaint to add Mr. Taylor and the Bank as additional defendants on September 4, 1987, and the amended complaint was filed on December 7, 1987.

The defendants are correct in stating that under the *Poquette* case, the 1983 version of 551.59(5) would apply to this case. In *Poquette*, the court assumed that the discovery of the fraud occurred no earlier than April 27, 1984, the date that § 551.59(5) was amended.

The *Poquette* court first determined that under the 1983 version of § 551.59(5) "[n]o equitable tolling doctrine relating to the effect of delayed discovery can be fairly read judicially into [§ 551.59(5)] ..." In a footnote, the court stated that it expressed no opinion as to whether the current version of § 551.59(5) is susceptible to the equitable tolling doctrine.

The *Poquette* court next determined that Wis.Stat. § 990.06 should be applied in de-

termining which version of § 551.59(5) to apply. Section 990.06 provides in relevant part:

> In any case when a limitation period of time prescribed in any act which shall be repealed for the acquiring of any right, or barring of any remedy, or for any other purpose shall have begun to run before such repeal and the repealing act shall provide any limitation or period of time for such purpose, such latter limitation or period shall apply only to such rights or remedies as shall accrue subsequently to the time when the repealing act shall take effect, and the act repealed shall be held to continue in force and be operative to determine all such limitations and periods of time which shall have previously begun to run unless such repealing act shall otherwise expressly provide.

In *Poquette*, the plaintiff argued that the three-year limitation period commenced at the moment of the act or transaction constituting the violation, but was immediately tolled until such time as the fraud was discovered by the victim. The plaintiff then argued that their cause of action accrued after April 27, 1984, when the fraud was discovered.

The *Poquette* court discussed the problems in construing § 990.06 because of the legislative use of two potentially inconsistent expressions—"period of time ... shall have begun to run" and "accrue." The court reasoned that if the court adopted the plaintiff's construction of the statute, the result would be that two different statutes of limitation applicable to the same cause of action would begin to run at different times and that, therefore, there could be hiatuses and overlapping of the time periods. The court stated that it proceeded on the assumption that the legislature intended to cause neither overlapping of earlier enacted limitations periods by the later enacted periods, nor hiatuses between the two. The court then stated that such a result:

> can be achieved by construing the words "such rights and remedies as shall accrue subsequently to the time when the repealing act shall take effect" as if they read "rights and remedies as to which no

limitation or period prescribed in any earlier act shall have begun to run prior to the time the repealing act shall take effect."

*Poquette* 631 F.Supp. 1480, 1485 (W.D.Wis. 1986).

 This court agrees with the *Poquette* court that it must apply § 990.06 in determining which version of § 551.59(5) to apply. This court declines to adopt the *Poquette* court's application of § 990.06. This court disagrees with the manner in which the plaintiff in *Poquette* framed the argument. In *Poquette*, the plaintiff contended that the limitation period commenced at the moment of the act or transaction constituting the violation, but was immediately tolled until such time as the fraud was discovered by the victim. The plaintiff then argued that the cause of action accrued after the current version of § 551.59(5) was adopted. In analyzing the case, the court accepted the plaintiff's contradictory contentions. The court concluded that under the plaintiff's construction of the statute there could be hiatuses and overlapping time periods. This court rejects the plaintiff's contention in *Poquette* that the limitation period commenced at the moment of the act or transaction constituting the violation. Although state law supplies the pertinent statute of limitations for Rule 10b–5 actions, the date when a claim accrues so as to trigger the state law limitation period is a matter of federal law. *Sargent v. Genesco, Inc.*, 492 F.2d 750, 758 (5th Cir.1974). It is also federal law which determines when the limitations period commences to run. *Trecker v. Scag*, 679 F.2d 703, 706 (7th Cir.1982). A federal cause of action accrues at the time when plaintiff, in the exercise of reasonable diligence, discovers or should discovery the fraud of which he complains. *Cook v. Avien*, 573 F.2d 685, 695 (1st Cir.1978); *Arneil v. Ramsey*, 550 F.2d 774, 780 (2d Cir.1977); *Hilton v. Mumaw*, 522 F.2d 588, 602 (9th Cir.1975); *Vanderboom v. Sexton*, 422 F.2d 1233, 1240–41 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970); *Tobacco & Allied Stocks, Inc. v. Transamerica Corp.*, 143 F.Supp. 323, 329 (D.Del.1956), *aff'd*, 244 F.2d 902 (3d Cir. 1957). *Cf. Hill v. Equitable Bank*, 655

F.Supp. 631, 638 (D.Del.1987). Under the federal equitable tolling doctrine, the statute does not begin to run until the plaintiff knows or, exercising reasonable diligence, should know of the alleged fraud. *Biggans v. Bache Halsey Stuart Shields,* 638 F.2d 605, 607, n. 3 (3d Cir.1980). Therefore, under federal law, a federal cause of action accrues and the limitations period commences to run when a plaintiff knows or, exercising reasonable diligence, should know of the alleged fraud.

In the case at bar, the plaintiffs' first indication that the rehabilitation project was in jeopardy or was not bona fide was in the spring of 1985. In applying federal law, the court finds that, based on the present record, plaintiffs' claim did not accrue and the state statute of limitations did not start to run until the spring of 1985. In applying § 990.06, the court finds that the 1984 version of § 551.59(5) applies to this case. The 1984 version of § 551.59(5) provides for a three-year statute of limitations. The plaintiffs had until the spring of 1988 in which to file their claim, and their claim is therefore timely filed.

IT IS THEREFORE ORDERED that the defendants Donald Taylor's and Waukesha State Bank's motion for summary judgment is denied.